**AMERICAN ASSOCIATION OF PEOPLE WITH DISABILITIES, et al., Plaintiffs,**

v.

**Kevin SHELLEY, Defendant.**

**Peter Benavidez, et al., Plaintiffs,**

v.

**Kevin Shelley, Defendant.**

**No. CV0401526FMCPJWX.**

United States District Court, C.D. California.

July 6, 2004.

Arlene B. Mayerson, Linda D. Kilb, Silvia Yee, Berkeley, CA, Carolyn R. Young, Eve L. Hill, Joanne E. Caruso, John E. McDermott, Howrey Simon Arnold & White, Paula D. Pearlman, Los Angeles, CA, Elizabeth Elaine Gardner, Washington, DC, Joe S. Rank, Robert M. Pepper, Riverside County Counsel, Riverside, CA, for Plaintiffs.

Kathleen Williams, pro se.

Plumas County, pro se.

Scott Konopasek, pro se.

San Bernardino Cnty, pro se.

Ann Barnett, pro se.

Kern County, pro se.

Riverside County, pro se.

Kevin Knutson, pro se.

Peter Benavidez, pro se.

## ORDER DENYING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER, OR, IN THE ALTERNATIVE, PRELIMINARY INJUNCTION

COOPER, District Judge.

This matter is before the Court on the Benavidez Plaintiffs' Application for Temporary Restraining Order, or, in the Alternative, Preliminary Injunction (docket # 5, Case No. 04–03318). This matter was heard on July 2, 2004, at which time the parties and amici were in receipt of the Court's tentative Order. For the reasons set forth below, the Court denies the Application for Temporary Restraining Order and the Alternative Motion.

### I. Introduction

Plaintiffs seek to enjoin Defendant Secretary of State Kevin Shelley's April 30, 2004, Directives which decertified and withdrew approval of the use of certain direct recording electronic (DRE) voting systems. The Court has read and considered the moving, responding, reply, and supplemental documents submitted by the parties, together with their voluminous ex-

hibits, and the amicus curiae briefs filed by Conny McCormack, Registrar of Los Angeles County, and the Electronic Frontier Foundation, California Voter Foundation, Verified Voting Foundation, and Voters Unite! in opposition to the Motion. The Court concludes that Plaintiffs have not demonstrated a likelihood of success on the merits. Moreover, the possibility of irreparable injury to Plaintiffs is substantially outweighed by the advancement of the public interest.

## II. Background

In 1999, the Accu–Vote–TS DRE voting system was approved for use in California.[1] In the ensuing years, other electronic voting systems, manufactured by a number of companies, were also given approval. By 2004, 14 counties in California used some form of DRE touch-screen voting system, and 43% of the state's voters used a DRE machine in the March 2, 2004 election. In response to reports of difficulties encountered throughout the state during the March primary, Secretary of State Shelley (Defendant) conducted a review of DREs in use in California. The review identified problems in the areas of testing and certification of software, reliability, accuracy, training, and security.

On April 21, 22, and 28, 2004, public hearings were conducted by the Voting System and Procedures Panel, a panel charged with the responsibility of reviewing proposed voting systems and modifications and making recommendations to Defendant regarding certification. At the hearings, testimony and documents were presented by hundreds of interested parties, including persons representing Plaintiffs' views in this case. At the conclusion of the hearings, the panel recommended that Defendant withdraw approval of the use of the Diebold Accu–Vote–TSx voting system (which system had been conditionally approved for use in California in November 2003), and withdraw approval of the use of other voting machine systems unless certain conditions were first satisfied.

Thereafter, on April 30, 2004, Defendant issued two Directives: "Decertification and Withdrawal of Approval of Accu–Vote–TSx Voting System As Conditionally Approved November 20, 2003, and Rescission of Conditional Approval" and "Decertification and Withdrawal of Approval of Certain DRE Voting Systems and Conditional Approval of the Use of Certain DRE Voting Systems."

These Directives are the subject of this lawsuit and request for injunction.[2]

## III. Plaintiffs' Claims

The individual plaintiffs in this action are registered voters in the State of California who have either visual or manual impairments which substantially limit one or more major life activities. They are, therefore, "qualified individuals with disabilities" within the meaning of the Americans With Disabilities Act. The organizational plaintiffs represent and support persons with disabilities.

---

**1.** "In touchscreen (DRE) systems, a voter whose eligibility has been verified by an election official is given a card that is used to activate a freestanding voting machine. On-screen directions tell the voter how to select candidates or issues by touching the screen over the corresponding choice. The voter may make changes by de-selecting a response already made, and making another selection in its place. The voter is required to review the entire ballot at the end of the process.

The voter then touches a yellow 'Cast Vote' cue on the last screen to record his or her vote." *Weber v. Shelley* 347 F.3d 1101, 1104 (9th Cir.2003).

**2.** On May 14, 2004, the Secretary issued a document entitled "Clarification of Conditions for Using Electronic Voting Machines in the November 2004 State–Wide General Election."

Plaintiffs urge the invalidation of Defendant's Directives, because their effect is to deprive them of the opportunity to vote using touch-screen technology. The importance of DREs to persons with handicaps is well established by the evidence presented by the moving parties. DRE systems contain an audio component which enables visually impaired voters to listen to candidates' names on headphones and to vote using distinctively shaped keys. DRE systems also contain mouth or head sticks, sip-and-puff devices, or other accessible switch technology that enables manually impaired voters to select candidates of their choice. Only with the use of these devices may such disabled voters, for the first time, vote independently and in private.

### IV. Standard for Issuance of a Preliminary Injunction

The Ninth Circuit has stated the legal standard justifying the issuance of a preliminary injunction in a number of ways. *See, e.g., United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174 (9th Cir.1987) (setting forth a four-part test that considers 1) likelihood of success on the merits; 2) the possibility of irreparable injury in the absence of an injunction; 3) a balancing of the harms; and 4) the public interest); *Regents of Univ. of California v. American Broadcasting Co.*, 747 F.2d 511, 515 (9th Cir.1984) (applying a three-part test that combines the second and third parts of the four-part test into one part); *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir.1993) (applying a two-part test that considers 1) whether a probability of success on the merits and the possibility of irreparable harm have been raised; or 2) whether serious questions have been raised and the balance of hardships tips sharply in the moving parties' favor), *cert. denied* U.S. 1030, 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994); *see also Oakland Tribune, Inc. v. Chronicle Publishing Co.*, 762 F.2d 1374, 1376 (9th Cir.1985) (suggesting that a high showing of likelihood of success on the merits lessens the degree of irreparable harm required to be shown by the moving party, and vice versa). These tests, although phrased differently, all require the Court to inquire into whether there exists a likelihood of success on the merits, and the possibility of irreparable injury; the Court is also required to balance the hardships. Additionally, because this case involves the accuracy of public elections, the Court finds the Ninth Circuit's four-part test, which requires inquiry into the public interest, to be particularly relevant here.

The Court begins by examining the likelihood of success on the merits as to each of Plaintiffs' claims.

### V. Likelihood of Success

*1. Americans with Disabilities Act ("ADA")*

■ The ADA applies to all programs, services, and activities of state and local governments, including elections. *See, e.g., AAPD v. Smith*, 227 F.Supp.2d 1276, 1289 (M.D.Fla.2002). Plaintiffs contend that decertification of touch-screen voting machines will alter the voting system and make the right to vote less accessible to disabled persons, citing 28 C.F.R. § 35.151(b). Plaintiffs assert that the Directives in question discriminate by reason of disability, amounting to state action that disproportionately burdens the disabled because of their unique needs.

■ The evidence does not support the conclusion that the elimination of the DREs would have a discriminatory effect on the visually or manually impaired. Although it is not disputed that some disabled persons will be unable to vote independently and in private without the use of DREs, it is clear that they will not be deprived of their fundamental right to

vote. Each plaintiff declares that he or she has voted in the past and intends to vote in the future. Title II of the ADA precludes the exclusion of the disabled from the services, programs or activities of any public entity. 42 U.S.C. § 12132. Title II requires only that programs be made "readily accessible to and usable by" people with disabilities. 28 CF.R. § 35.150. The evidence establishes that long before the conditional certification of DREs, counties utilized a number of programs to provide handicapped persons with ready access to voting equipment. As provided in the controlling regulations, a public entity may employ such means as "assignment of aides to beneficiaries ... or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(b)(1).

It cannot be disputed that casting a vote independently and secretly would be preferred over casting a vote with the assistance of a family member or other aide. However, the ADA does not require accommodation that would enable disabled persons to vote in a manner that is comparable in every way with the voting rights enjoyed by persons without disabilities. Rather, it mandates that voting programs be made accessible, giving a disabled person the opportunity to vote.[3] Nothing in the Americans with Disabilities Act or its Regulations reflects an intention on the part of Congress to require secret, independent voting. Nor does such a right arise from the fact that plaintiff counties attempted to provide such an accommodation. Plaintiffs did not acquire rights by virtue of the temporarily discontinued experiment with electronic voting machines.

Plaintiffs have established no likelihood of success on the merits of their Americans With Disabilities Act claim.

### 2. Help America Vote Act of 2002:

The Help America Vote Act ("HAVA") mandates that each voting system used in a federal election "shall be accessible for individuals with disabilities ... in a manner that provides the same opportunity for access and participation (including privacy and independence) as for other voters." 42 U.S.C. § 15481(a)(3)(A). Under HAVA, any voting system in use on or after January 1, 2006, must use "at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place." 42 U.S.C. § 15482(a)(3)(B).

■■■ One of the conditions for certification in Defendant's directives is the utilization of a Voter Verified Paper Audit Trail ("VVPAT"). Plaintiffs assert that such a condition cannot be met by January 1, 2006, if at all, and, if the Secretary's Directives are followed, California counties will not be able to offer voters with disabilities the accessible voting equipment HAVA demands. The flaw in Plaintiffs' argument, of course, is that it is based on speculation. No evidence has been presented to the Court to establish that it is impossible, or even difficult, for manufacturers of DREs to comply with HAVA's requirements by January 1, 2006. On the contrary, Amici Electronic Frontier Foundation, et al., provide evidence that several DREs are already equipped with VVPAT capability and have been federally qualified. Plaintiffs also insist that DREs will

---

**3.** For example, in discussing the obligation to provide voting services, to the disabled, the Title II Technical Assistance Manual explains that a blind voter is not entitled to cast a ballot in Braille, even though this method would allow him to vote in private. Because the County "can demonstrate that its current system of providing assistance is an effective means of affording an individual with a disability an equal opportunity to vote, the County need not provide ballots in Braille." Title II Technical Assistance Manual, § 7.1100.

not be certified in time to allow them to vote independently in the November 2004 presidential election. If this prediction is accurate, it is unfortunate. However, given its effective date of January 1, 2006, HAVA does not compel a different result.

■ Plaintiffs' claim under HAVA is not ripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated and indeed may not occur at all." *Texas v. United States,* 523 U.S. 296, 300, 118 S.Ct. 1257, 1259, 140 L.Ed.2d 406 (1998) (internal quotation marks and citations omitted). Plaintiffs have not demonstrated a likelihood of success on their claim that Defendant's Directives are in contravention of the Help America Vote Act.

*3. Equal Protection:*

Plaintiffs argue that the deprivation of the right to vote independently is tantamount to disenfranchisement of several hundred thousand disabled voters. Additionally, they contend, because DRE's are far more accurate than any other voting system, millions of voters will not have their votes counted at all if DREs are not utilized;[4] this loss of the fundamental right to vote is a violation of the Fourteenth Amendment and the voters' right to equal protection.

■ The decision of the Secretary of State to decertify touch-screen voting machines, pending their compliance with certain auditing and security requirements, is not subject to a strict scrutiny analysis, despite the involvement of a fundamental right to vote.

A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the ... Fourteenth Amendment that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's right."

*Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (internal quotation marks and citations omitted).

[W]e have developed (although only recently) a framework for assessing the constitutionality, under the First and Fourteenth Amendments, of state election laws. When a State's rule imposes severe burdens on speech or association, it must be narrowly tailored to serve a compelling interest; lesser burdens trigger less exacting review, and a State's important regulatory interests are typically enough to justify reasonable restrictions. [citations]

4. This conclusion is based on the declaration of Professor Henry E. Brady, Ph.D., who concluded, based on the number of residual votes in the March 2004 election in Los Angeles County, that one in eight to one in five votes had not been counted. Dr. Brady filed a second declaration, in which he acknowledged that his original conclusion was based on erroneous data. However, he continues to believe that Los Angeles' residual vote rate was higher than other large counties in California, demonstrating that the Inka Vote system is not as reliable as DREs. The Court is not persuaded by Dr. Brady's opinion and conclusions. In both declarations, Dr. Brady, who is not a statistician, relies only on residual vote rate to draw his conclusions concerning the efficacy of different voting systems. Additionally, he asserts as a basic premise that the vast majority of undervotes in the March 2004 election were unintentional. The Court is not satisfied that there is any scientifically tested or peer-reviewed research to support the notion that most undervotes are unintentional or due to system error. Comparing only residual vote rates is not a scientifically valid method of comparing voting system performance. (*See* Declaration of Jonathan N. Katz). Accordingly, the Court does not consider the Brady declaration.

*Buckley v. American Constitutional Law Foundation,* 525 U.S. 182, 208, 119 S.Ct. 636, 649, 142 L.Ed.2d 599 (concurring opinion).

Because we are concerned here with a temporary change in the method by which voters cast their ballots, the case involves not a severe restriction on the right of citizens to vote, but rather a lesser burden, triggering less exacting review. The Court will, therefore, determine whether there is a rational basis for Defendant's action. *See Board of Trustees of the University of Alabama v. Garrett,* 531 U.S. 356, 365–68, 121 S.Ct. 955, 963–64, 148 L.Ed.2d 866 (2001).

Defendant's decisions were based on the following findings:

1. The DRE voting systems currently in use do not produce an accessible voter-verified paper audit trail which would permit voters to independently verify the accuracy of their votes;

2. they do not permit meaningful recounts;

3. they may not permit a contest to be decided by a meaningful recount;

4. it is extremely difficult, if not impossible, to determine whether software has been compromised;

5. the technology is difficult to operate and repair; and

6. the machines may be subject to erroneous programming, tampering, or manipulation.

■ Defendant's decision to suspend the use of DREs pending improvement in their reliability is certainly a rational one, designed to protect the voting rights of the state's citizens. Plaintiffs have established no likelihood of success as to this claim, notwithstanding the possibility that the Directives may have an unintentional discriminatory effect on the ability of disabled persons to cast their votes in private.

**4. Elections Code:**

■ Plaintiffs cite Cal. Elections Code §§ 19227 for the proposition that Defendant's Directives violate the mandate to provide at least one accessible voting system per polling place for the blind and visually impaired. Section 19227(b) requires at least one voting unit that provides blind and visually impaired persons with "access that is equivalent to that provided to individuals who are not blind or visually impaired, including the ability for the voter to cast and verify all selections made by both visual and nonvisual means."

Plaintiffs contend that requiring manufacturers to install a Voter Verified Paper Audit Trail in each DRE will violate the requirement that visually impaired persons have equal access to verification of their votes. However, Defendant is obligated by Elections Code § 19205, to assure that any voting system is safe from fraud or manipulation. Following an extensive study of the March election, the Office of the Secretary of State concluded that numerous problems and concerns were disclosed, suggesting that "DRE technology may not yet be stable, reliable and secure enough to use in the absence of an accessible; voter-verified, paper audit trail (AVV-PAT)." (Report on the March 2, 2004, Statewide Primary Election Prepared by the Office of the Secretary of State, p. 2).

■ Although a state must preserve the right to vote for all its citizens, it is entitled to broad leeway in enacting reasonable, even-handed legislation affecting elections. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

Defendant's decision to modify DREs to include VVPAT technology is a reasonable one, well within his discretion and authori-

ty, and consistent with his obligation to assure the accuracy of election results.

[*E*]*very* electoral law and regulation necessarily has *some* impact on the right to vote, yet to strike down every electoral regulation that has a minor impact on the right to vote would prevent states from performing the important regulatory task of ensuring that elections are fair and orderly. The Supreme Court recognized as much in *Burdick*, observing that "[e]lection laws will invariably impose some burden upon individual voters."

*Weber v. Shelley*, 347 F.3d 1101, 1104 (9th Cir.2003) (internal quotation marks and citations omitted).

Plaintiffs have not established a likelihood of success as to their claim based on the California Elections Code.

### 5. Due Process:

■ Plaintiffs contend that the Secretary of State decertified DREs without notice and a hearing. The record belies this contention. Public notice of a three-day hearing was provided, in compliance with the requirements of Elections Code § 19204. Plaintiffs respond that the notice was inadequate, in that it referred only to "Voting Systems for Use in November 2004 General Elections" and did not advise that decertification was being considered. Nonetheless, the evidence before the Court demonstrates that Plaintiffs received actual notice that the issue of decertification was on the table. There was significant public response to the notice, the vast majority of which concerned the continued use of electronic voting machines. Further, there was substantial public participation in the meeting, including participation by advocates for voters with disabilities.

Plaintiffs have therefore failed to establish a likelihood of success as to their due process claim.

### 6. Lack of Statutory Authority:

Plaintiffs assert the following premise in support of this contention: By decertifying DREs and by requiring that DREs utilize a VVPAT, the Secretary of State is making policy. Only the Legislature sets policy; the Legislature then delegates authority to the Secretary to execute that policy, according to certain standards. The Secretary must then issue Regulations, pursuant to the Administrative Procedures Act; otherwise, his actions are void.

■ The flaw in the argument is the initial conclusion that the Secretary is improperly usurping the legislative authority to make policy by decertifying electronic voting machines absent compliance with certain requirements, including the VVPAT. The policy at issue in this case has already been established by the Legislature, as codified in Elections Code § 19100, et seq. The Secretary is authorized to approve and regulate voting machines and devices, and to regularly review systems in use to assure fulfillment of the provisions of the Elections Code and the Secretary's regulations. (Cal. Elec.Code §§ 19100, 19200, 19205). If any voting systems are deemed by the Secretary to be defective, obsolete, or otherwise unacceptable, "the Secretary of State has the right to withdraw his or her approval previously granted..." (Cal. Elec.Code § 19222).

■ The Secretary is, therefore, not only authorized, but expressly directed, to withdraw his approval of any voting system found to be defective or unacceptable. "[T]he contemporaneous administrative construction of [an] enactment by those charged with its enforcement ... is entitled to great weight, and courts generally will not depart from such construction unless it is clearly erroneous or unauthorized." *People ex rel Lungren v. Superior Court*, 14 Cal.4th 294, 309, 58 Cal.Rptr.2d

855, 926 P.2d 1042 (1996) (internal quotation marks and citations omitted). Accordingly, Plaintiffs have failed to establish that they are likely to prevail on their claim that the Secretary of State lacked statutory authority to issue the Directives.

### 7. Abuse of Discretion:

As this Court has previously concluded in its evaluation of Plaintiffs' other claims, the Secretary of State reasonably exercised his discretion in concluding that DREs must not be used in California until specific steps are taken to assure their reliability. Accordingly, Plaintiffs have failed to establish a likelihood of success as to their abuse of discretion claim.

### 8. California Administrative Procedures Act:

 Plaintiffs' argument that the Secretary's Directives are in violation of the Administrative Procedures Act ("APA") is not well taken. The Directives were issued, as previously observed, under the authority of the Elections Code, which authorizes the Secretary, at § 19222, to withdraw approval of previously certified voting systems. As explained above, in connection with Plaintiffs' sixth claim, the Secretary was not adopting a new policy, the execution of which would require the adoption and approval of regulations in compliance with the Administrative Procedures Act. He was simply carrying out his responsibilities under laws and regulations already in force.

This issue was the subject of oral argument at the hearing. The Court questioned Plaintiff's counsel regarding the effect of Plaintiffs' contention that the Decertification Directive was invalid as a result of the failure to follow the APA. The Secretary of State acknowledged that the only regulations adopted pursuant to the Elections Code were regulations regarding tabulation of election results; no regulations have been promulgated regarding voting equipment. Were the Court to accept Plaintiff's contention that the April 30, 2004, Directive was invalid as a result of the failure to follow the APA, the same fate would befall the original November 20, 2003, Directive, which gave provisional certification to DREs, and Plaintiffs would still not be entitled to the relief they seek.

Plaintiffs argued that certification of voting machines should be treated differently from decertification of those machines. Plaintiffs noted that there is specific statutory authority for the certification of voting machines. See Elections Code § 19205 ("The Secretary ... shall establish the specifications for and the regulations governing voting machines ... The criteria for establishing the specifications and regulations shall include, but not be limited to ... (a) the machine ... shall be suitable for the purpose for which it is intended[;] (b) [t]he system shall preserve the secrecy of the ballot[; and] (c) [t]he system shall be safe from fraud or manipulation."). However, the Secretary countered that there is also specific statutory [authority] for the withdraw[al] of the Secretary's approval. See Elections Code § 19222 ("The Secretary ... shall review voting systems periodically to determine if they are defective, obsolete, or otherwise unacceptable. The Secretary ... has the right to withdraw his or her approval ... of any voting system or part of a voting system should it be defective or prove otherwise unacceptable after such review."). These statutes provide similar guidance to the secretary. Machines may be certified by the Secretary if they are suitable for voting, preserve secrecy, and are safe from fraud or manipulation. Elections Code § 19205. By the same token, the Secretary may decertify machines that are "defective, obsolete, or otherwise unacceptable." Elections Code § 19222. The Court sees no meaningful

distinction between these two statutes that would justify imposing the requirements of the APA on the decertification process without also imposing it on the certification process. In fact, subjecting the certification process, but not the decertification process to the APA would be more likely result, as § 19205 specifically refers to "regulations" and § 19222 does not.

Therefore, Plaintiffs have failed to establish a likelihood of success on the merits as to their Administrative Procedures Act claim.

*9. Contracts Clause:*

▆▆ Plaintiffs allege that the decertification directives impair contracts in violation of the United States and California Constitutions. In support, they assert that Riverside County entered into contracts with Sequoia Voting Systems and the California Voting Modernization Board for the use of Sequoia AVC Edge DRE voting systems in their county. The decertification Directive, they argue, impairs those contracts.

▆▆ While factually accurate, the contention does not give rise to a basis for injunctive relief in favor of Plaintiffs. The only plaintiffs with standing to assert this claim are the plaintiff counties. A subordinate political entity, such as a county, may not challenge a state's actions under the Contract Clause. *Williams v. Mayor of Baltimore*, 289 U.S. 36, 40, 53 S.Ct. 431, 432, 77 L.Ed. 1015, 1020 (1933); *Mallon v. City of Long Beach*, 44 Cal.2d 199, 209, 282 P.2d 481 (1955). Accordingly, the county plaintiffs have failed to establish a likelihood of success on the merits of their contracts claim.

*10. Estoppel*

This claim is based on the position of the plaintiff counties that they detrimentally relied on Defendant's certification of DREs. Implied in this argument is the contention that Defendant promised the counties they would be able to continue to use the machines in the future. The fallacy in this argument is found in the language of Elections Code § 19222, which authorizes the Secretary of State to decertify any voting system he finds to be unreliable. Therefore, Plaintiffs have failed to establish a likelihood of success on the merits of their estoppel claim.

As to all claims, Plaintiffs have failed to establish a likelihood of success on the merits.

## VI. Irreparable Harm, Balancing of Hardships, and the Public Interest

▆▆ Although there is admittedly harm to the disabled plaintiffs, whose right to vote unassisted is diminished by the absence of electronic voting machines, that harm is not irreparable. The hardship suffered by Plaintiffs if the DREs are not used is the inability to vote unassisted and in private. As explained above, this is not a right currently protected by law. The hardship faced by Defendant in the event the Court were to issue an injunction is that he would be in danger of being precluded from following the duties conferred on him by Cal. Elections Code § 19205, and ensuring an accurate count of all votes cast in the November election and thereafter. Similarly, the public interest in the accuracy of the upcoming election cannot be overestimated.

The interest of the Secretary of State in fulfilling his statutory duties and the public interest in accurate, verifiable vote counts outweigh the Plaintiffs' interest in an unassisted, private vote. Therefore, the irreparable injury, balancing of interests, and the public interest factors weigh against the granting of a preliminary injunction.

## VII. Conclusion

Plaintiffs have not demonstrated a likelihood of success on the merits as to any

claim in this action. Defendant's decision to decertify touch-screen voting machines and to withhold further certification until he is satisfied that manufacturers and counties have complied with specified conditions is a reasonable one. It is based on studies conducted and information gathered which convinced him that the voting public's right to vote is not adequately protected by the systems currently in place.

Plaintiffs' Request for Temporary Restraining Order, or, in the Alternative, Preliminary Injunction, is denied.