[No. D052744. Fourth Dist., Div. One. Aug. 29, 2008.]

COUNTY OF SAN DIEGO et al., Plaintiffs and Appellants, v.
DEBRA BOWEN, as Secretary of State, etc., Defendant and Respondent;
COUNTY OF KERN et al., Interveners and Appellants.

**COUNSEL**

John J. Sansone, County Counsel, Timothy M. Barry and Dennis I. Floyd, Deputy County Counsel, for Plaintiffs and Appellants.

Kathleen Bales-Lange, County Counsel (Tulare) and Teresa M. Saucedo, Deputy County Counsel, for the Counties of Tulare, Kings, Contra Costa, Butte, Fresno and Yuba as Amici Curiae on behalf of Plaintiffs and Appellants.

Ruth E. Stringer, County Counsel, and Daniel B. Haueter, Assistant County Counsel, for Interveners and Appellants County of San Bernardino and Kari Verjil.

Joe S. Rank, County Counsel, Robert M. Pepper and Tawny V. Lieu, Deputy County Counsel, for Interveners and Appellants County of Riverside and Barbara Dunmore.

Bernard C. Barmann, Sr., County Counsel, and Steven L. Sanders, Deputy County Counsel, for Interveners and Appellants County of Kern and Ann K. Barnett.

Edmund G. Brown, Jr., Attorney General, Christopher E. Krueger, Assistant Attorney General, Douglas J. Woods and Susan K. Leach, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**IRION, J.**—As part of a program intended to ensure the integrity of California elections, Debra Bowen, in her official capacity as the California Secretary of State (the Secretary), decertified and then immediately recertified a number of voting systems in use throughout the state. As a condition of recertification, the Secretary imposed a comprehensive system of postelection manual ballot tallying on local elections officials. In this appeal, we consider a challenge raised by plaintiffs County of San Diego and Deborah Seiler, in her official capacity as Registrar of Voters for the County of San Diego, and interveners the counties of Kern, Riverside and San Bernardino (collectively, the Counties) to these requirements.[1] The Counties contend that the Secretary does not have the authority to impose the tallying requirements and that even if the Secretary does possess such authority, she was required, but failed, to act pursuant to the mandates of the Administrative Procedure Act (the APA).

As we explain below, we disagree with the Counties on the question of the Secretary's authority to issue the ballot tallying requirements. We agree, however, that the Secretary's issuance of the requirements was subject to the APA. Consequently, regardless of the wisdom of, or necessity for, the postelection manual ballot tallying requirements, they are void under California law due to the Secretary's failure to adhere to the procedures set forth in the APA.

[1] In January 2008, by stipulation of the parties, the following filed their complaints in intervention: County of Kern, Ann K. Barnett, in her official capacity as the Auditor-Controller, County Clerk for the County of Kern; County of Riverside, Barbara Dunmore, in her official capacity as the Registrar of Voters for the County of Riverside; and County of San Bernardino, Kari Virgil, in her official capacity as the Registrar of Voters for the County of San Bernardino.

## FACTS

In 2007, the Secretary retained the University of California and a team of computer security experts to evaluate the security, reliability and accessibility of voting systems approved for use in California. Upon completion of this review, on August 3, the Secretary withdrew her approval of the voting systems[2] studied by the review team, including certain Diebold, Sequoia and Hart InterCivic voting systems. The Secretary simultaneously issued a conditional reapproval of each of the voting systems that set forth approximately 40 preconditions to their use.

One of the conditions common to each of the reapprovals indicated that the Secretary would impose, and the Counties would be required to follow, "post-election manual count auditing requirements," in addition to those already required by statute.[3] The conditional reapprovals were amended on October 25, with the postelection manual count condition revised to state this point more precisely: "Elections officials must comply with . . . requirements as set forth by the Secretary of State in the document entitled 'Post-Election Manual Tally Requirements' and any successor document." That same day, the Secretary issued a stand-alone document entitled "Post-Election Manual Tally Requirements" (the PEMT).

The PEMT sets forth a fairly comprehensive postelection manual tally procedure. Of particular importance to this appeal, the PEMT requires that: (i) "Elections officials shall conduct a manual tally of 10% of randomly selected precincts for any contest where the margin of victory is less than one half of one percent (0.5%)"; (ii) in contests that span multiple jurisdictions (e.g., statewide contests), "if the margin of victory within a given jurisdiction is more than 0.5%, but the overall margin . . . is *less* than 0.5%, then each jurisdiction involved in the contest shall conduct a manual tally of 10% of the precincts in which voters cast ballots for that contest in the jurisdiction"; and (iii) the tallies "must be completed within the canvass period established by Elections Code §10262 and §15372." (See §§ 335.5 [defining " 'official canvass' "], 353.5 [defining " 'semifinal official canvass' "].)

On December 18, 2007, the County of San Diego and Deborah Seiler, in her official capacity as the Registrar of Voters for the County of San Diego (County of San Diego), filed a complaint for declaratory and injunctive relief

---

[2] A " '[v]oting system' " is defined in Elections Code section 362 as "any mechanical, electromechanical, or electronic system and its software, or any combination of these used to cast or tabulate votes, or both."

[3] The condition states that the "Secretary of State shall establish additional post-election manual count auditing requirements," including "[i]ncreased manual count sample sizes for close races . . . ."

and a petition for writ of mandate in the superior court, asking the court to void the PEMT. County of San Diego argued that the Secretary had overstepped her statutory authority in issuing the PEMT and that, even if she possessed the authority to issue the PEMT, she could only do so pursuant to the APA. In January 2008, the parties stipulated to permitting the counties of Kern, Riverside and San Bernardino to intervene in the case.

On January 22, 2008, the trial court denied the Counties' request for relief. The court concluded that the Secretary had acted within her legislatively delegated authority in issuing the challenged requirements, and that, because the PEMT did not constitute a "regulation," the Secretary was not required to comply with the APA. The Counties appeal.[4]

### DISCUSSION

The Counties challenge the Secretary's issuance of the PEMT on two separate and independent grounds. First, the Counties contend that the Secretary exceeded her statutory authority by imposing the ballot tallying requirements contained in the PEMT. Second, the Counties argue that the PEMT is invalid because it is a "regulation" that was not adopted in accordance with the APA. We address each of these arguments separately below.

### I

*The Issuance of the PEMT Is Within the Secretary's Statutory Authority*

The Counties first contend that the PEMT is "void as a matter of law" because the Secretary lacks authority to enact postelection manual tally requirements. More specifically, they argue that because the Legislature already has established postelection tallying requirements, the Secretary lacks any authority "to enlarge the scope of the [existing] post-election manual tally."

---

[4] The Counties requested expedited consideration of this appeal and asked that the court issue its decision "as far before the November 2008 Presidential General Election as possible." We granted the request for expedited consideration.

Tulare, Kings, Contra Costa, Butte, Fresno and Yuba counties have jointly filed an amicus curiae brief supporting the Counties' position in this court.

■ The Counties' argument touches on two separate limitations on agency action. First, agency action must "be within the scope of authority conferred" by the Legislature, and cannot be inconsistent with its authorizing statutes. (Gov. Code, §§ 11342.1, 11342.2; see *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 321 [87 Cal.Rptr.2d 423, 981 P.2d 52] (*Agnew*) ["it is well established that the rulemaking power of an administrative agency does not permit the agency to exceed the scope of authority conferred on the agency by the Legislature"]; *Ontario Community Foundations, Inc. v. State Bd. of Equalization* (1984) 35 Cal.3d 811, 816 [201 Cal.Rptr. 165, 678 P.2d 378] [" '*there is no agency discretion to promulgate a regulation which is inconsistent with the governing statute*' "].)[5] Second, even if an agency action is consistent with its authorizing statutes, the action may still be deemed void if it conflicts with another statute. (*Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 419 [128 Cal.Rptr. 183, 546 P.2d 687] (*Agricultural Labor Relations Bd.*) [" 'Administrative regulations that violate acts of the Legislature are void . . . .' "]; see also *Tolman v. Underhill* (1952) 39 Cal.2d 708, 712 [249 P.2d 280] [regulation may also be invalid where it "attempts to impose additional requirements in a field which is fully occupied by statute"].)[6]

Thus our analysis has two parts. First, we must determine whether the Secretary's issuance of the PEMT falls within the authority granted to her by the Legislature. If, as we will conclude, the Legislature did grant the Secretary sufficient statutory authority to issue the PEMT, we must then evaluate whether the exercise of that authority in the instant case conflicts with existing statutory manual tallying requirements.[7]

---

[5] The statutory constraints on an agency's ability to adopt regulations apply with equal force to more informal agency action because "[a]n agency may not exceed the limits of its authority by adopting and enforcing a policy which would not be permitted as a formally adopted regulation." (*Agnew, supra,* 21 Cal.4th at p. 321.)

[6] As our high court has explained: "The doctrine has been most frequently invoked to strike down administrative regulations in conflict with the statute which created the agency or which the agency is authorized to administer. [Citations.] But the principle is equally applicable when the regulation contravenes a provision of a different statute." (*Agricultural Labor Relations Bd., supra,* 16 Cal.3d at p. 420.)

[7] There is often a third part of the analysis. Agency action pursuant to Legislative authority will also be deemed void if it is not " ' "reasonably necessary to effectuate the purpose of the [authorizing] statute." ' " (*Agnew, supra,* 21 Cal.4th at p. 322, quoting Gov. Code, § 11374.) The Counties do not contend that the Secretary's actions are void on this ground. There is, however, a brief discussion of the merits of the PEMT in the Counties' reply brief, although the discussion is not linked to the legal standard referenced above. To the extent these statements in the reply brief are intended as a "reasonably necessary" challenge, we deem it forfeited for purposes of this appeal. (See *Julian v. Hartford Underwriters Ins. Co.* (2005) 35 Cal.4th 747, 761, fn. 4 [27 Cal.Rptr.3d 648, 110 P.3d 903] [argument not raised in opening

A. *The Legislature's Broad Delegation of Authority to Regulate Voting Systems Includes the Authority to Condition Voting System Use on Postelection Tallies*

The first question we address is the Secretary's statutory authority to issue the PEMT's tallying requirements.

■ Our analysis begins with the sweeping grant of authority provided by the Legislature to the Secretary with respect to the conduct of elections generally. Government Code section 12172.5 states in part: "The Secretary of State is the chief elections officer of the state, and shall administer the provisions of the Elections Code. The Secretary of State shall see that elections are efficiently conducted and that state election laws are enforced." The Secretary also is empowered by this provision to "adopt regulations to assure the uniform application and administration of state election laws." (*Ibid.*)

■ Of particular relevance to the instant appeal, there also are numerous statutory provisions that grant the Secretary specific authority over the use of voting systems. Elections Code[8] section 19201 provides that "[n]o voting system, in whole or in part, shall be used unless it has received the approval of the Secretary of State . . . ." (§ 19201, subd. (a); see also § 19201, subd. (b) ["No jurisdiction may purchase or contract for a voting system, in whole or in part, unless it has received the approval of the Secretary of State."].) Section 19100 states that the Secretary "shall study and adopt regulations governing the use of voting machines, voting devices, and vote tabulating devices." (§ 19100.) Section 19205 provides:

"The Secretary of State shall establish the specifications for and the regulations governing voting machines, voting devices, vote tabulating devices, and any software used for each, including the programs and procedures for vote tabulating and testing. The criteria for establishing the specifications and regulations shall include, but not be limited to, the following:

---

brief and not "fully made" in reply brief forfeited for purposes of appeal].) We, therefore, do not purport to address the wisdom of the requirements contained in the PEMT, or the necessity for those requirements to effectuate the purposes of the various statutes authorizing their issuance.

Because these questions are not properly before us, we deny the opposed June 27, 2008, request for judicial notice of public reports on the security of certain voting machines, as irrelevant to our decision. We grant the unopposed portion of the June 27 request, however, and take judicial notice of the submitted portion of the legislative history of an amendment to Elections Code section 15360. We also grant the Counties' unopposed July 17, 2008 request that we take judicial notice of the Secretary's conditional approval of the InkaVote Plus Precinct Ballot Counter Voting System.

[8] All statutory references are to the Elections Code unless otherwise indicated.

"(a) The machine or device and its software shall be suitable for the purpose for which it is intended.

"(b) The system shall preserve the secrecy of the ballot.

■ "(c) The system shall be safe from fraud or manipulation." The Secretary also is directed to "review voting systems periodically to determine if they are defective, obsolete, or otherwise unacceptable" and may "withdraw his or her approval previously granted under this chapter of any voting system or part of a voting system should it be defective or prove unacceptable after such review." (§ 19222.)

Given the broad delegation of powers described above, it cannot seriously be disputed that the Secretary possesses sufficient statutory authority to issue the PEMT.

■ At a minimum, the Secretary's broad authority to approve voting systems, and to "establish the specifications for and the regulations governing" voting devices and the "procedures for vote tabulating and testing," includes the authority to condition approval of the use of particular voting machines on certain procedural safeguards, including a postelection manual tally. (§ 19205.) This is all that the Secretary has done in issuing the PEMT.[9]

B. *The PEMT Does Not Conflict with Section 15360*

The Counties largely recognize that, standing alone, the Legislative authority described in the preceding section would authorize issuance of the PEMT. They contend, however, that the PEMT is invalid because it conflicts with existing statutes, primarily the statewide 1 percent manual postelection tally already required by the Legislature in section 15360.[10]

---

[9] In their reply brief, the Counties assert, without citation to any authority, that while the Secretary is authorized to regulate *procedures* for vote tabulating and testing, this authorization applies only to "the process by which [the] ballots are counted," not a *"substantive* requirement, i.e., the scope of the manual tally." We are unconvinced by the Counties' argument. The postelection tallying requirements in the PEMT fall squarely within the Secretary's authority, and particularly within the "usual and ordinary meaning" of a "procedure" for vote tabulating and testing. (*Allen v. Sully-Miller Contracting Co.* (2002) 28 Cal.4th 222, 227 [120 Cal.Rptr.2d 795, 47 P.3d 639] (*Allen*) [in interpreting a statute, courts must look to the "usual and ordinary meaning" of statutory text and " 'the plain meaning of the language governs' "]; § 19205.)

[10] The Counties argue: "While the Secretary of State has general authority over voting systems, that authority is constrained by section 15360's provisions, which specifically govern the scope of the 1% post-election annual tally."

Section 15360 directs that: "During the official canvass of every election in which a voting system is used, the official conducting the election shall conduct a public manual tally of the ballots tabulated by those devices, including vote by mail voters' ballots, cast in 1 percent of the precincts chosen at random by the elections official." (§ 15360, subd. (a).)

The Counties argue that section 15360 represents a legislative policy declaration that postelection manual tallying of 1 percent of the precincts is both necessary *and sufficient* to ensure the accuracy of the vote. Consequently, they contend, the Secretary's regulations countermand or, at least, "vary the terms of" section 15360 by imposing additional manual tallying requirements. The Counties further assert that the Secretary's actions have significant real-world consequences because postelection tallying is "time and labor intensive" and imposes substantial financial costs.

As we have noted, " '[a]dministrative regulations that violate acts of the Legislature are void . . . .' " (*Agricultural Labor Relations Bd., supra,* 16 Cal.3d at p. 419.) The Counties, however, overstate this prohibition with repeated assertions that the Secretary could not enhance the statutory postelection manual tally requirements because a state agency may not "increase," "enlarge" or "vary the terms of a statute." The applicable limitation on agency action is not nearly as sweeping as the Counties suggest.

■ The authority of an agency to alter or enhance the scope of existing statutory law is primarily a question of legislative intent. The Legislature may delegate authority to an agency to, by regulation, enhance or alter existing statutory pronouncements. Agency regulations that result are not void, but rather constitute an indirect manifestation of legislative intent. (See, e.g., *Agricultural Labor Relations Bd., supra,* 16 Cal.3d at p. 420 [upholding agency regulation that created an exception to the criminal trespass statute].) As explained by our Supreme Court, "[t]he Legislature can surely accomplish indirectly that which it could do directly." (*Ibid.* ["If the Legislature can thus depart from its existing dispositions on a given topic, it can authorize an administrative agency to do so on its behalf."].)

Thus, the question in this appeal is not whether the PEMT enlarges or varies the existing tally requirements imposed by section 15360. Rather, it is whether, in issuing it, the Secretary exceeded her statutory authority. (*Agricultural Labor Relations Bd., supra,* 16 Cal.3d at p. 419 [" 'an administrative agency may not usurp the legislative function . . .' "].)

■ To answer this question we first turn to the text of section 15360. (*Allen, supra,* 28 Cal.4th at p. 227 ["statutory language . . . is the most reliable indicator of legislative intent"].) Section 15360 appears on its face

to be concerned solely with assuring the accuracy of the vote, not with limiting unnecessary vote tallying. Indeed, the explicit intent of section 15360, as expressed in a companion statute, is "to verify the accuracy of the automated count." (§ 336.5.)[11] The statute does not state that elections officials should manually tally *no more than* or *only* 1 percent of the precincts; similarly, it does not state that *it will be sufficient* to tally 1 percent of the precincts. Rather the statute simply provides that local elections officials must perform a 1 percent tally in every election.[12] As the statute does not appear to impose any limit on tallying, there is, contrary to the Counties' contention, no facial conflict between section 15360 and the PEMT.[13]

In addition, related statutory provisions provide abundant support for the Secretary's issuance of manual tallying requirements that enhance the existing statutory framework. (Cf. *People v. Jefferson* (1999) 21 Cal.4th 86, 94 [86 Cal.Rptr.2d 893, 980 P.2d 441] [recognizing " ' "the statutory scheme of which the statute is a part" ' " as a valid indicator of legislative intent].) These provisions (discussed below) demonstrate a legislative awareness that the Secretary might condition voting system use on procedural requirements (including tallying requirements) that were more exacting than those already imposed by statute, and evidence a legislative intent to authorize such enhanced requirements. (*Agricultural Labor Relations Bd., supra,* 16 Cal.3d at p. 420 [Legislature can implicitly authorize agency to enact regulations that alter existing statutory framework].)

■ Section 19002 states, in no uncertain terms, that if there is any conflict between the provisions in division 19 and "other provision[s] of this code relating to the same subject matter," the provisions of division 19 "shall be controlling." (§ 19002.) The Secretary's authority to issue regulations governing voting systems (such as those contained in the PEMT)[14] is contained in division 19 of the Elections Code. The official canvass requirements imposed by section 15360 are contained in "other provision[s]" of the

---

[11] Section 336.5 states: " 'One percent manual tally' is the public process of manually tallying votes in 1 percent of the precincts, selected at random by the elections official, and in one precinct for each race not included in the randomly selected precincts. This procedure is conducted during the official canvass to verify the accuracy of the automated count."

[12] The Counties emphasize that the statute authorizes local "elections official[s]" (i.e., not the Secretary) to increase the number of precincts tallied. (§ 15360, subd. (a).) This provision, again, does not suggest any *limitation* on tallying. If anything, this provision suggests a legislative recognition that increased tallies are sometimes warranted.

[13] The Counties' argument that the PEMT conflicts with section 15360 is further undermined by the fact that the PEMT has a much narrower scope than section 15360. While section 15360 requires a 1 percent tally in every election, the PEMT's 10 percent tally requirements are triggered in only a narrow subset of election contests where the margin of victory is less than 0.5 percent.

[14] As we will explain in part II, *post*, despite the Secretary's protestations to the contrary the PEMT is properly characterized as a regulation.

Elections Code, division 15. (§ 19002.) Consequently, the statute expresses a legislative intent to permit a regulation promulgated under division 19 to alter or enhance other Elections Code provisions, and to preclude courts from invalidating such a regulation on the basis of a challenge such as that raised here. (See *Agricultural Labor Relations Bd., supra*, 16 Cal.3d at p. 420 [relying on analogous provision in permitting agency regulation that altered scope of statute]; *George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1985) 40 Cal.3d 654, 662 [221 Cal.Rptr. 488, 710 P.2d 288] [explaining that "[i]f there is any conflict between Code of Civil Procedure section 1013 and the regulations of the board, the latter . . . prevail" due to provision granting precedence to statutory section authorizing issuance of regulations].)

The legislative intent with regard to any discrepancy between section 15360 and the Secretary's regulation of voting systems is made even clearer in section 15003. That section states in part: "Elections officials shall adopt semifinal official and official canvass procedures to conform to the applicable voting system procedures that have been approved by the Secretary of State." (§ 15003.) Section 15360 is part of official canvass procedures imposed on local elections officials. (See § 15360, subd. (a) ["During the official canvass of every election in which a voting system is used"]; § 335.5 ["The 'official canvass' . . . includes the . . . performance of the manual tally of 1 percent of all precincts."].) The PEMT's 10 percent tally requirements *imposed as a condition of the use of certain voting systems* constitute a "voting system procedure[] . . . approved by the Secretary of State." (§ 15003; see *Allen, supra*, 28 Cal.4th at p. 227 [courts look to the "usual and ordinary meaning" of statutory text and " 'the plain meaning of the language governs' "]; § 362 [defining " '[v]oting system' " as "any mechanical, electromechanical, or electronic system and its software, or any combination of these used to cast or tabulate votes, or both"].) Consequently, the import of section 15003 is plain. In the event of any inconsistency, local elections officials' implementation of section 15360 must "conform to" the requirements of the Secretary's voting system regulations issued under division 19 of the Elections Code (e.g., the requirements contained in the PEMT). (§ 15003.)[15] This enactment, like section 19002, demonstrates that the Legislature granted the Secretary authority to enhance existing canvass procedures, and intended that the Secretary's regulations, if otherwise authorized, would not be invalidated on the ground that they altered this existing statutory framework.[16]

---

[15] In light of sections 19002 and 15003, the Counties' argument that "section 15360 . . . takes precedence over sections 19201, 19205, and 19222" is erroneous. The opposite is true.

[16] Section 15003 follows section 15002 which makes clear the applicability of section 15003 in this context. Section 15002 states: "No later than January 1 of each even-numbered year, the Secretary of State shall review, and if necessary amend, administrative procedures for use with each of the voting systems pursuant to Division 19."

The Counties acknowledge that under sections 19002 and 15003, "local elections officials must adopt *procedures* for the post-election official canvass (during which the post-election manual tally occurs), and those *procedures* must conform to other *procedures* approved by the Secretary of State." They contend, however, that the "Secretary's authority to approve use procedures . . . is different from the authority to impose a new substantive standard"—the characterization given by the Counties to the PEMT.[17] We are unconvinced by this argument. The PEMT's requirement that local elections officials manually count a certain percentage of ballots in close elections to ensure the accuracy of specified voting systems fits comfortably within the "usual and ordinary meaning" (*Allen, supra,* 28 Cal.4th at p. 227) of the term "procedure"—i.e., "a particular way of doing or of going about the accomplishment of something." (Webster's 3d New Internat. Dict. (2002) p. 1807.) Consequently, " 'the plain meaning of the language governs,' " and the Counties' argument that the postelection tally requirement is somehow not a procedure fails. (*Allen,* at p. 227.)

Apart from the arguments noted above, the Counties muster little authority to counter the express statutory pronouncements of legislative intent in sections 19205, 19002, 19100, and 15003. They rely primarily on a statement in the Legislative Counsel's Digest concerning a 2006 amendment to section 15360 (the statute itself dates back over three decades) that implies some recognition on the Legislature's part as to the costs of manual tallying.[18] This proves little.

We can readily accept that the Legislature understood that increasing election tallying requirements imposes financial costs (although, in point of fact, the Secretary has directed that the costs of the PEMT be borne by voting system vendors). Nevertheless, this understanding sheds no light on whether

---

[17] The Counties attempt to support this argument with a request submitted less than one week before oral argument, asking that we take judicial notice of five exhibits. The exhibits include documents prepared by a voting system vendor and submitted to the Secretary, a document drafted by the County of San Diego describing its canvass procedures, and a posting by the Secretary containing instructions for the manual tally. The exhibits do not appear to be the proper subject of judicial notice under Evidence Code section 452, subdivision (h)—the sole authority cited by the Counties. In addition, none of these materials appear to have been before the trial court, and have no bearing on the legislative intent in enacting the statutes discussed above. Consequently, we deny the request for judicial notice. (*Conlan v. Shewry* (2005) 131 Cal.App.4th 1354, 1364, fn. 5 [32 Cal.Rptr.3d 667] [denying request for judicial notice in analogous circumstances].)

[18] The 2006 amendment required the manual tally to include absentee ballots. The Legislative Counsel's Digest states in pertinent part: "The California Constitution requires the state to reimburse local agencies . . . for certain costs mandated by the state. . . . [¶] [I]f the Commission on State Mandates determines that the bill contains costs mandated by the state, reimbursement for those costs shall be made pursuant to these statutory provisions." (Legis. Counsel's Dig., Assem. Bill No. 2769 (2005–2006 Reg. Sess.).)

the Legislature intended by enacting section 15360 in 1965[19] to preclude the imposition of any additional costs even when, in the Secretary's opinion, such costs are necessary to ensure an accurate election tally for particular voting systems. The legislative history cited by the Counties adds nothing to the analysis.

In sum, there is nothing in the statute or the extrinsic aids to statutory interpretation to suggest that the Legislature intended section 15360 to constitute a *limitation* on postelection manual tallies. To the contrary, there is abundant evidence of the Legislature's intent to grant the Secretary broad authority to impose conditions on the use of voting systems (§§ 19205, 19100), including conditions such as a manual tally that alter the existing postelection canvass requirements (§ 15003). Further, to the extent any conflict exists between voting system regulations issued by the Secretary and section 15360, the legislative intent is equally clear. The Secretary prevails. (§§ 19002, 15003.)

The Counties' similar argument that the PEMT is void because it is "tantamount to an order directing a 'recount' " is equally unconvincing. While recounts are specifically provided for under existing statutory law, there is nothing in the PEMT that undermines or conflicts with those statutory recount procedures. (§§ 15600–15642, 16000 et seq.) Further, the Legislature has expressed an intent that the Secretary participate not only in adopting regulations "for each voting system approved for use in the state" but also in specifying "the *procedures for recounting ballots* . . . using those voting systems." (§ 15601, italics added.) Thus, as with the postelection manual tally in section 15360, there is no conflict between the PEMT and the statutory recount procedures. Even if the PEMT can be viewed as imposing additional recount procedures, the Legislature has expressly authorized such action in section 15601.[20]

---

[19] The 1 percent tally in section 15360 is derived from former section 15417, which was added to the Elections Code in 1965. (See Historical and Statutory Notes, 29 West's Ann. Elec. Code (2003 ed.) foll. § 15360.) The legislative history of section 15417 reflects that it originally was added to address concerns about the accuracy of the "punchcard voting systems" of that era. (Walter C. Stutler, Asst. Sect. of State, mem. to Frank Mesple, Legis. Sect., Governor's Off., re Assem. Bill No. 1368 (1965 Reg. Sess.) July 2, 1965, p. 1.) The other statutory provisions noted above were enacted more recently by the Legislature (for example, § 15003 was enacted in 1998) and better reflect the Legislature's intent with respect to modern voting procedures.

[20] The two cases relied on by the Counties, *Pardee Construction Co. v. California Coastal Com.* (1979) 95 Cal.App.3d 471 [157 Cal.Rptr. 184] and *Agnew, supra,* 21 Cal.4th 310, are easily distinguished, as the state agency action in each case undermined a legislative or constitutional provision without any legislative (or constitutional) authority to do so. At issue in *Pardee* was a statute mandating that any person with vested development rights was not required to secure certain additional permits, " 'providing that no substantial changes' " were made to the preapproved development. (*Pardee,* at p. 474.) The court ruled that the California

## II

### *The PEMT Is a Regulation*

The Counties argue in the alternative that even if the Secretary possessed statutory authority to issue the PEMT, she was required, but failed, to follow the requirements of the APA in doing so. We conclude that this argument is meritorious.

 The Government Code provides that no state agency[21] "shall issue, utilize, enforce, or attempt to enforce any guideline, criterion, bulletin, manual, instruction, order, standard of general application, or other rule, which is a regulation as defined in Section 11342.600," unless it does so pursuant to the APA. (Gov. Code, § 11340.5, subd. (a).) The requisite procedures under the APA include providing public notice of the proposed regulatory action; issuing a complete text of the proposed regulation with a statement of the reasons for it; granting interested parties an opportunity to comment on the proposed regulation; responding in writing to public comments; and forwarding a file of all materials on which the agency relied in the regulatory process to the Office of Administrative Law, which reviews the regulation for consistency with the law, clarity and necessity. (*Morning Star Co. v. State Bd. of Equalization* (2006) 38 Cal.4th 324, 333 [42 Cal.Rptr.3d 47, 132 P.3d 249] (*Morning Star*).) The APA includes an exception and streamlined procedure for enacting "an emergency regulation." (Gov. Code, § 11346.1.) It is undisputed that in issuing the PEMT, the Secretary did not follow the requirements of the APA, or issue the tallying requirements as an emergency regulation. Consequently the dispositive question for this appeal is whether the PEMT is a "regulation."

 The APA "defines 'regulation' very broadly." (*Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 571 [59 Cal.Rptr.2d 186, 927 P.2d 296] (*Tidewater*).) " 'Regulation' means every rule, regulation, order, or standard of general application or the amendment, supplement, or

---

Coastal Commission could not, through its general authority to promulgate regulations, add additional permitting conditions on the maintenance of vested development rights. (*Id.* at pp. 477–478.) In *Agnew*, our Supreme Court reviewed a policy of the State Board of Equalization that required a taxpayer to prepay a disputed tax *with accrued interest* as a precondition to an action challenging that tax. The court held that the Equalization Board's interpretation was contrary to the state Constitution's "unambiguous[] state[ment] that [such] an action may be maintained after payment of 'a *tax* claimed to be illegal.' " (*Agnew*, at p. 323.)

[21] " '[S]tate agency' " is defined by statute to include "every state office, officer, department, division, bureau, board, and commission," with the specific exception of the California State University. (Gov. Code, § 11000, subd. (a).) The Secretary does not dispute that she is a " 'state agency' " under this definition. (*Ibid.*)

revision of any rule, regulation, order, or standard adopted by any state agency to implement, interpret, or make specific the law enforced or administered by it, or to govern its procedure." (Gov. Code, § 11342.600.) Whether an agency action constitutes a regulation is a question of law that we review de novo. (*Grier v. Kizer* (1990) 219 Cal.App.3d 422, 434 [268 Cal.Rptr. 244].)

 Our Supreme Court in *Tidewater* identified "two principal identifying characteristics" that distinguish regulations from other agency proclamations. (*Tidewater, supra,* 14 Cal.4th at p. 571.) First, a regulation must be intended "to apply generally, rather than in a specific case." (*Ibid.*; see also *Winzler & Kelly v. Department of Industrial Relations* (1981) 121 Cal.App.3d 120, 127 [174 Cal.Rptr. 744] (*Winzler & Kelly*).) Second, a regulation "must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Tidewater,* at p. 571, quoting Gov. Code, former § 11342, subd. (g), now Gov. Code, § 11342.600.)

The Secretary contends that the PEMT fails to satisfy either of the two prongs of the *Tidewater* test. First, she argues that the PEMT is not a standard of general application because it does "not apply to every voting system" in use in California. Specifically, the Secretary contends that there are three counties (Lake, Madera and Sonoma) that use voting systems that do not trigger the PEMT requirements, and two other jurisdictions (Los Angeles and San Francisco) that are covered by additional, more stringent, manual tallying requirements.[22]

 We find the Secretary's argument on this point unconvincing. While there may be a few exceptions to the PEMT's broad coverage, a rule need not "apply universally" to satisfy the first *Tidewater* prong; "a rule applies generally so long as it declares how a certain class of cases will be decided." (*Tidewater, supra,* 14 Cal.4th at p. 571; see *Roth v. Department of Veterans Affairs* (1980) 110 Cal.App.3d 622, 630 [167 Cal.Rptr. 552] ["the word 'general' means pertaining to all of the members of a class, kind, or order"].) Here, the PEMT establishes a rule that decides a "class of cases" (*Tidewater,* at p. 571) by mandating that the vast majority of counties, by virtue of their use of the most common voting systems, comply with specific postelection manual tally requirements. In effect, the PEMT mandates a comprehensive and virtually uniform scheme of manual ballot tallying throughout California. Such a scheme applies "generally, rather than in a specific case." (*Ibid.*)

Further, the Counties dispute, with some force, the contention that the PEMT does not, in fact, apply universally. The two jurisdictions (Los Angeles

---

[22] The Secretary acknowledged in the trial court that the requirements contained in the PEMT "apply to a large majority of voting systems in the state."

and San Francisco) that the Secretary contends are covered by more stringent requirements than the PEMT appear, at least at the present time, to also be subject to the PEMT. Thus, only the counties of Lake, Madera and Sonoma appear to be exempt from the PEMT's requirements, and the Counties assert, without dissent from the Secretary, that these counties make up only 2 percent of the State's voting population. Finally, the PEMT appears to place certain manual tallying requirements on even those three counties. In any multijurisdictional election that is decided by less than 0.5 percent of the votes cast, the PEMT purports to require all counties, regardless of the voting system in place, to engage in a 10 percent manual recount.[23]

In sum, given the PEMT's establishment of essentially uniform statewide tallying requirements, the document meets the threshold for a standard of general application, rather than a pronouncement of the agency's conclusion as to a specific case. (*Tidewater, supra,* 14 Cal.4th at p. 571; *Morning Star, supra,* 38 Cal.4th at p. 333 [concluding that Department of Toxic Substances Control's unwritten determination that all companies with 50 or more employees use or conduct activities related to hazardous materials was a regulation, as it applied " 'generally, rather than in a specific case' "].)

We recognize, as the Secretary emphasizes, that the PEMT grew out of an individualized review of specific voting systems. These origins, however, cannot change the ultimate "effect and impact" of the PEMT. (*Winzler & Kelly, supra,* 121 Cal.App.3d at p. 127.) The PEMT, through incorporation into various voting system reapprovals and by its own terms, constitutes a broad statement of policy applicable to local elections officials throughout the state. (*Ibid.* ["Whether the action of a state agency constitutes a regulation does not depend on the designation of the action, but rather on its effect and impact on the public."].) Such a pronouncement of policy is indistinguishable from an announcement by the Secretary that all counties (excepting three) henceforth must follow the manual tallying procedures contained in the PEMT—something that would indisputably constitute a standard of general application.

Having determined that the PEMT has sufficient general applicability to satisfy the first prong of the *Tidewater* test, we turn to the second prong. For

---

[23] It is unclear how this provision applies to counties that are not currently utilizing the voting systems covered by conditional approval documents incorporating the PEMT. We need not attempt to resolve this conundrum, however. Instead, we expect that this ambiguity will be resolved as the PEMT is subjected to the " 'exacting' " procedures of the APA. (*Morning Star, supra,* 38 Cal.4th at p. 333.)

a rule to constitute a regulation under the second prong, the rule "must 'implement, interpret, or make specific the law enforced or administered by [the agency], or . . . govern [the agency's] procedure.' " (*Tidewater, supra*, 14 Cal.4th at p. 571, quoting Gov. Code, former § 11342, subd. (g), now Gov. Code, § 11342.600.) This requirement is easily satisfied here.

The PEMT makes concrete various provisions of the Elections Code that authorize the Secretary to act (primarily through the adoption of "regulations") to ensure the reliability of electronic voting systems. The Secretary argues, and we agree, that her "authority to issue the PEMT Requirements . . . is found directly in Elections Code sections 19201, 19205 and 19222," as well as within other areas of the Elections Code.[24] These cited sections, however, do not specify any particular tallying requirements. Consequently, it can hardly be disputed that the PEMT " 'make[s] specific the law enforced' " by the agency. (*Tidewater, supra*, 14 Cal.4th at p. 571.)

The Secretary disagrees that *Tidewater*'s second prong is satisfied, arguing somewhat obtusely that "the PEMT Requirements were issued pursuant to the Secretary of State's direct authority *to act*." (Original italics.) The contention, while relevant to the argument we addressed in part I, *ante*, has no significance here. It is not the case, and the Secretary cites no authority for the proposition, that an agency can avoid the requirements of the APA by establishing that it issued a regulation pursuant to its "direct authority to act." Indeed, if the agency lacked the authority to act, there would be no issue as to whether the agency should have proceeded under the APA, as its promulgation would be invalid on other grounds. (Gov. Code, § 11342.1.)[25]

---

[24] We cannot help but notice the significant tension between the Secretary's responses to the two challenges raised by the Counties. She argues with respect to the initial challenge that her issuance of the PEMT is authorized by statutes that, in large part, authorize the adoption of "regulations." (See § 19100 [granting Secretary authority to "study and adopt regulations governing the use of voting machines"]; § 19205 [granting authority to "establish the specifications for and the regulations governing voting machines"]; Gov. Code, § 12172.5 [granting authority to "adopt regulations to assure the uniform application and administration of state election laws"].) She then asserts that she was not bound to the mandates of the APA because her action did not constitute a "regulation."

[25] There is nothing in the cited code sections that requires the Secretary to promulgate the precise rules established by the PEMT. Consequently, there can be no argument that the PEMT is exempt from the APA's requirements because it is "the only legally tenable interpretation of a provision of law." (See Gov. Code, § 11340.9, subd. (f) [excepting compliance requirements where agency's interpretation is "the only legally tenable interpretation of a provision of law"]; *Morning Star, supra*, 38 Cal.4th at pp. 336–337 ["the exception for the lone 'legally tenable' reading of the law applies only in situations where the law 'can reasonably be read only one way' [citation], such that the agency's actions or decisions in applying the law are essentially rote, ministerial, or otherwise patently compelled by, or repetitive of, the statute's plain language"].)

The sole authority cited by the Secretary to support its contention that the PEMT fails *Tidewater*'s second prong is a federal district court opinion. In that opinion, a district court ruled that the Secretary of State's decertification of certain voting systems was not a regulation under the APA. (*American Ass'n of People with Disabils. v. Shelley* (C.D.Cal. 2004) 324 F.Supp.2d 1120, 1123 (*AAPD*) [declining to issue an injunction to directives of the Secretary of State that "decertified and withdrew approval of the use of certain direct recording electronic (DRE) voting systems"].) The *AAPD* decision is not binding as it was rendered by a federal court and is, as noted below, easily distinguished. (*Howard Contracting, Inc. v. G. A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 52 [83 Cal.Rptr.2d 590] ["federal decisional authority is neither binding nor controlling in matters involving state law"].)

We would readily accept that the decertification of particular voting systems based on concerns about their reliability (as in *AAPD, supra*, 324 F.Supp.2d 1120) would not constitute a regulation under the APA. (See *Tidewater, supra*, 14 Cal.4th at p. 571 ["interpretations that arise in the course of case-specific adjudication are not regulations, though they may be persuasive as precedents in similar subsequent cases"]; Gov. Code, § 11340.9, subd. (i) ["A regulation that is directed to a specifically named person or to a group of persons and does not apply generally throughout the state."].) System-specific decertification, however, is a far cry from the sweeping manual tally rules established by the PEMT. The PEMT is not a simple decertification, or even a recertification of a particular voting system with conditions. Rather, the PEMT is a stand-alone document that, as a condition of use of virtually all types of voting machines employed in the state, requires local elections officials to comply with uniform postelection manual tally procedures. This type of agency pronouncement, unlike the decertification of a specific voting system, falls squarely within the definition of a regulation under California law.

In sum, the PEMT satisfies both prongs of the definition of a regulation under California law. The Secretary does not contend that she is otherwise exempted from the requirements of the APA, or that she satisfied those requirements. Consequently, the PEMT is void. (Gov. Code, § 11340.5; *Morning Star, supra*, 38 Cal.4th at p. 334 [recognizing that where "both indicia of a regulation exist, the Department should have complied with the APA, unless an exception applies"].) The trial court's ruling to the contrary is, therefore, erroneous, and we reverse.

## DISPOSITION

Reversed.

Benke, Acting P. J., and Huffman, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 12, 2008, S167391.