Filed 11/24/25 (unmodified opinion attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| KINGS COUNTY FARM BUREAU et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> STATE WATER RESOURCES CONTROL BOARD, <br><br> Defendant and Appellant. | F088720 <br><br> (Kings Super. Ct. No. 24CU0198) <br><br> **ORDER MODIFYING OPINION** <br> [NO CHANGE IN JUDGMENT] |

This court has received and considered the State Water Resources Control Board's request to modify the opinion to correct typos and clarify certain technical concepts. We agree with the request. It is ordered that the published opinion filed herein on October 29, 2025, be modified as follows:

1.  In the middle of the last paragraph on page 4, "The second point, in 2020, considered whether those local agencies had adopted groundwater plans for high-priority basins. (§ 10735.2, subd. (a)(2).)" is deleted and the following is inserted in its place:

    The second point, in 2020, considered whether those local agencies had adopted groundwater plans for high- and medium-priority critically overdrafted basins. (§ 10735.2, subd. (a)(2).)

2.  The last sentence beginning on page 4, "The next intervention points, in 2022 and 2025, provided similar checks for medium-priority basins. (§ 10735.2, subd. (a)(4), (5).)" is deleted and the following sentence inserted in its place:

    The next intervention points, in 2022 and 2025, provided similar checks for other high- and medium-priority basins. (§ 10735.2, subd. (a)(4), (5).)

3. On page 6, the first sentence of the third full paragraph, "The Tulare subbasin is a high-priority basin under the Act" is deleted and the following sentence is inserted in its place:

> The Tulare subbasin is a high-priority, critically overdrafted basin under the Act.

4. On page 16, in the first full paragraph beginning with "Notably," both references to "sustainability yield" are deleted and replaced with "sustainable yield."

Except for the modifications set forth, the opinion previously filed remains unchanged. These modifications do not effect a change in the judgment.

HILL, P. J.

WE CONCUR:


DETJEN, J.


FAIN, J.*

---

\*      Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KINGS COUNTY FARM BUREAU et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> STATE WATER RESOURCES CONTROL BOARD, <br><br> Defendant and Appellant. | F088720 <br><br> (Super. Ct. No. 24CU0198) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kings County.  Kathy Ciuffini, Judge.

Rob Bonta, Attorney General, Tracy L. Winsor, Assistant Attorney General, Michael P. Cayaban and Myung J. Park, Acting Assistant Attorneys General, Sierra S. Arballo, Margaret V. Tides, Kate D. Fritz, and Lauren Ashley Week, Deputy Attorneys General, for Defendant and Appellant.

Paris Kincaid Wasiewski, Valerie C. Kincaid, Timothy J. Wasiewski, and Jonathan R. Marz for Plaintiffs and Respondents.

Griswold, LaSalle, Cobb, Gin & Dowd and Raymond L. Carlson for City of Lemoore as Amicus Curiae on behalf of Plaintiffs and Respondents.

-ooOoo-

This is the second of two related proceedings arising from the same underlying case.  In the first proceeding, we considered whether the trial court correctly denied the State Water Resources Control Board's (the State Board's) demurrer to a writ of mandate and complaint filed by Kings County Farm Bureau, Helen Sullivan, and Julie Martella (collectively, the Farm Bureau).  We concluded that the trial court erred, and we issued a writ of mandate.  In this proceeding, we consider whether the trial court correctly issued a preliminary injunction against the State Board.

The core concern underlying the litigation is groundwater drawn from the Tulare Lake groundwater subbasin (Tulare subbasin).  In 2014, California passed a significant new set of laws known as the Sustainable Groundwater Management Act (the Act) (Wat. Code, § 10720 et seq.).[1]  The Act regulates California's groundwater by identifying its most impacted basins, mandating local agencies govern those basins, requiring those agencies to submit sustainable use plans for state approval, and allowing for state intervention if needed.

In the Tulare subbasin, the State Board is attempting to implement statutorily required monitoring, reporting, and fee provisions triggered when state intervention results in a basin being designated as probationary.  The Farm Bureau contends the State Board is exceeding its authority and filed a writ of mandate and complaint to stop the State Board's conduct.  The State Board currently contends the claims in the complaint are improper but has yet to respond to the writ of mandate.  Relevant to this appeal, the trial court has entered a preliminary injunction barring the State Board from, among other things, taking any action related to the probationary designation based partly on the writ claims and partly on the complaint claims.  These rulings have effectively halted the State Board's plans.

---

[1]     Undesignated statutory references are to the Water Code.

2.

In this opinion, we conclude the trial court abused its discretion in granting the preliminary injunction issued. For the reasons set forth below, we reverse that order and remand for further proceedings.

## OVERVIEW OF THE ACT[2]

The Act essentially mandates locally developed and managed plans for sustainably using over-drafted groundwater basins. Under the terms of the Act, certain prioritized groundwater basins "must be managed under a new groundwater sustainability plan, or a coordinated set of plans" (groundwater plans). (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 840.) "Where groundwater … plans are required, one or more local groundwater sustainability agencies must be formed to cover the basin and prepare and implement the applicable groundwater … plans." (*Id.* at p. 841.) These groundwater plans are then "reviewed by the [Department of Water Resources] to ensure that over a period of 20 years, 'sustainable groundwater management' is achieved." (*Ibid.*)

At the local level, the Act grants local groundwater sustainability agencies (groundwater agencies) with "a number of powers, including the power to perform any act necessary to carry out" the Act's purposes, along with authority "to impose fees on groundwater extraction to fund the costs" of the sustainability programs, groundwater management, investigations, and enforcement. (*Mojave Pistachios, LLC v. Superior Court* (2024) 99 Cal.App.5th 605, 616.) All of these powers are designed to support the adopted groundwater plans, which are essentially a complex analysis of the relevant basin along with, among other things, measurable objectives and interim milestones, "to

---

**2** As noted in the introduction, this is one of two related proceedings arising out of the same underlying action. Accordingly, the relevant background information is applicable to both cases. This court has therefore repeated its overview of the Act and generally repeats, with some relevant additions, its overview of the relevant facts and procedures from *State Water Resources Control Bd. v. Superior Court* (Oct. 29, 2025, F088909) __ Cal.App.5th __ [Cal.App. Lexis ____].

3.

achieve the sustainability goal in the basin." (§ 10727.2, subd. (b).) The sustainability goal is another complex concept that seeks to determine the annual amount of water that can be extracted from the groundwater basin over a 50-year time period without undesirable results, such as chronic lowering of groundwater levels, significant and unreasonable reduction of groundwater storage, and significant and unreasonable land subsidence, among others. (See § 10721, subds. (r), (v), (w), (x).) The groundwater plans can include such actions as the monitoring and management of groundwater levels, quality, and land subsidence, as well as mitigation of overdraft and groundwater recharging. (§ 10727.2, subd. (d).)

A cornerstone of the Act "is a transfer of responsibility for groundwater management from the state to local jurisdictions when possible." (*Environmental Law Foundation v. State Water Resources Control Bd.* (2018) 26 Cal.App.5th 844, 863.) Thus, the Act generally requires actions by local groundwater agencies, which are then subject to evaluation and assessment by the state through the Department of Water Resources (the Department). (§ 10733.) However, if certain actions are not taken, the adopted groundwater plans are deemed inadequate, or the groundwater plans are not being implemented in a manner that will meet the sustainability goal, the State Board may intervene at one of several intervention points and designate the basin as a probationary basin. (§ 10735.2.)

Notably, the Act is generally structured as a long-term process. Initially enacted in 2014, the Act's intervention points were spread over several years. The first intervention point, in 2017, considered whether local groundwater agencies had been appropriately formed. (§ 10735.2, subd. (a)(1).) The second point, in 2020, considered whether those local agencies had adopted groundwater plans for high-priority basins. (§ 10735.2, subd. (a)(2).) This intervention point also considered whether, at that point or later, those plans were adequate and implemented in a manner that would likely achieve the sustainability goal. (§ 10735.2, subd. (a)(3).) The next intervention points, in 2022 and

4.

2025, provided similar checks for medium-priority basins. (§ 10735.2, subd. (a)(4), (5).) In addition to the multiple intervention points spread over multiple years, the Act generally takes a long-term approach to reaching sustainability, specifically stating the groundwater plan must include measurable objectives and milestones that reach sustainability within 20 years of implementation and allowing for regular reviews of local agencies' progress. (See §§ 10727.2, subd. (b)(1) [objectives to achieve sustainability goal within 20 years of implementation], 10733 [requiring periodic review], 10733.8 [requiring review at least every five years after initial submission of plan].)

Although preferring local management, part of the penalty when intervention becomes necessary is the imposition of state mandates. These mandates are triggered by the probationary basin designation. Once that designation is made, local agencies are given a period of time—either 180 days or one year depending on the basis for the intervention—to remedy any errors leading to the intervention. (§§ 10735.4, 10735.6.) If the groundwater plan is not corrected, the State Board is given the right to develop and eventually adopt its own interim plan. (§ 10735.8.)

In addition, another set of statutes are triggered after a probationary designation. Under these statutes, certain entities that extract groundwater from a probationary basin more than 90 days after that designation are required to submit reports concerning their extractions to the State Board and pay associated fees. (§§ 5202, 5203.) The reports include monthly records of the extractions, measured "by a methodology, water-measuring device, or combination thereof satisfactory" to the State Board, among other things. (§ 5203.) The fees imposed are designed for the State Board to recover the costs of the intervention process, "in an amount sufficient to cover all costs incurred and expended from the Water Rights Fund," and can be spread over multiple years. (§ 1529.5, subd. (c).) Failing to file the required reports may result in an investigation by the State Board that must be paid for by the person investigated and potential criminal and civil penalties. (§§ 5107, 5204, 5208.)

5.

To the extent relevant, this court will provide additional details on the various statutory requirements of the Act when discussing the issues raised in this case.

## GENERAL FACTUAL AND PROCEDURAL BACKGROUND

Similar to the overview of the Act, this court provides a general factual and procedural background for context. As these actions reach us after a demurrer and a motion for preliminary injunction, we rely on the complaint and submissions related to those proceedings for our overview. Additional detail will be provided when relevant to the underlying issues.

The Tulare subbasin is a high-priority basin under the Act. Accordingly, under the Act, local communities formed five groundwater agencies that worked collectively to manage the Tulare subbasin. These five groundwater agencies developed a single groundwater plan for the Tulare subbasin. In January 2020, the groundwater agencies submitted the groundwater plan to the Department.

Two years later, the Department issued a determination that the groundwater plan was incomplete and provided the groundwater agencies with 180 days to remedy those deficiencies. The groundwater agencies submitted a revised groundwater plan in July 2022. In March 2023, the Department again determined the groundwater plan was inadequate.

The State Board drafted and published a staff report reviewing the groundwater plan, identifying potential remedial actions and recommending the probationary designation be imposed.

The staff report was made available to the public in October 2023. Around the same time, the State Board posted notice of the hearing related to the proposed probationary designation on its Web site and purports to have sent the notice by electronic mail to its internal listserv, the Department, each city and county within the Tulare subbasin, and to each of the groundwater agencies. In addition, informational workshops were held and public comments taken prior to the hearing.

6.

The hearing then occurred in April 2024. At that time, the State Board agreed with the recommendations in the staff report and designated the Tulare subbasin as a probationary basin under State Board resolution No. 2024-0012. After this designation, the State Board published information related to the monitoring and reporting conditions that are triggered by the designation, along with relevant deadlines. In addition, later declarations indicate that the State Board also mailed additional information to groundwater extractors in the Tulare subbasin but did so in a manner that allegedly provided little if any time for those extractors to comply.

In May 2024, not long after the probationary designation, the Farm Bureau filed its petition for writ of mandate and complaint. The filing contained nine causes of action, both writ claims and declaratory relief claims, with some of these specifically identifying multiple theories when discussing the claim.[3] The first cause of action, a writ claim, alleged the probationary designation was arbitrary and capricious because 10 different alleged deficiencies lacked adequate factual support. The second cause of action, another writ claim, challenged the determination that no portion of the Tulare subbasin could be excluded under the good actor exclusion on the grounds that the State Board misinterpreted the law and failed to support the finding factually. The third cause of action, a complaint claim, alleged an equal protection violation. The fourth cause of action, a writ claim, identified seven aspects of the staff report that allegedly demonstrate the State Board was exceeding its legal authority. The fifth cause of action, another writ claim, alleged the State Board failed to notify landowners of the probationary hearing. The sixth cause of action, a complaint claim, sought declaratory relief and alleged that seven aspects of the staff report reflect improper underground regulations adopted by the State Board. The seventh cause of action, another complaint claim, sought declaratory relief and alleged the fees imposed as a result of the probationary designation violate the

---

[3]     We only provide a note about these subparts at this time. Where such subparts are relevant, we provide a fuller discussion in the course of our opinion.

7.

California Constitution and Water Code section 1529.5. The eighth cause of action, a writ claim, made the same general allegations as the seventh cause of action. Finally, the ninth cause of action, a complaint claim, sought general declaratory relief as to whether the probationary designation complied with all applicable laws, rules, and regulations.

The State Board responded by filing a demurrer to as to the third, sixth, seventh, and ninth causes of action in the complaint. Around the same time, the Farm Bureau requested a temporary restraining order or preliminary injunction to prevent the monitoring and fee requirements and attached the groundwater plan, staff report, and other relevant documents and declarations. The State Board opposed the request and also submitted several declarations and documents related to the underlying procedures.

In July 2024, the trial court issued an order to show cause regarding the preliminary injunction request and granted a temporary restraining order preventing the State Board from (1) requiring extractors of more than 500 acre-feet from installing meters, (2) requiring extractors of more than two-acre feet to report their extractions and pay associated fees, and (3) requiring groundwater extraction reports to be submitted by December 2024.

Following this order, the State Board submitted a supplemental opposition, which included several declarations and exhibits detailing efforts the State Board made to provide notice to required parties ahead of the probationary designation hearing and the public impacts of current groundwater management practices. The Farm Bureau submitted a reply and included documents showing actions also occurring in other basins to further support their positions. As the court proceeded to a hearing on this matter, it extended the temporary restraining order.

The court held a hearing on the preliminary injunction request in August 2024. At that time, additional questions were asked about the proper amount of any required bond. Subsequent to the hearing, the State Board submitted a written response to the court's questions and included a declaration stating that "lost fee revenue" would be between

8.

$1.7 and $5.5 million, depending on the timeframe considered.  The Farm Bureau objected to this filing.

While this was ongoing, the Farm Bureau submitted its opposition to the demurrer, and the State Board submitted a reply.  On September 12, 2024, the trial court issued a 33-page order on the preliminary injunction request.  The next day, September 13, 2024, the trial court heard and ruled on the State Board's demurrer.[4]

In summary, the trial court granted the preliminary injunction and granted in part and denied in part the demurrer.  With respect to the preliminary injunction, the trial court began with a detailed discussion of the background and procedural posture of the case, including a summary of its temporary restraining order.  The trial court then considered its jurisdiction, finding the injunction request was not barred by a failure to exhaust administrative remedies and concluding the statutory prohibition against enjoining the execution of a public statute as set out in Civil Code section 3423, subdivision (d) and Code of Civil Procedure section 526, subdivision (b)(4) did not apply in light of the challenges raised by the Farm Bureau.

The trial court then considered whether to issue a preliminary injunction.  In doing so, it first considered the merits of the Farm Bureau's claims, determining the Farm Bureau was likely to succeed on its second, fourth, fifth, and sixth causes of action.  Turning next to the balance of harms, the trial court determined the harms to the Farm Bureau "have been and will be substantial if a preliminary injunction is not issued," and that those harms "are far greater than any harms identified by [the State Board], which at this point have been minimal."  The trial court reviewed and accepted several declarations submitted by the Farm Bureau.  The trial court similarly reviewed, but

---

[4]    The State Board requests this court take judicial notice of the fact that the trial court dismissed the Farm Bureau's third cause of action, asserting an equal protection violation.  As noted in *State Water Resources Control Bd. v. Superior Court, supra*, __ Cal.App.5th __ [Cal.App. Lexis ____], this dismissal occurred in the course of the demurrer proceedings.  With no opposition filed, we GRANT the State Board's February 20, 2025 request for judicial notice.

rejected, declarations submitted by the State Board, finding a lack of nexus between the statements made and the harm alleged. Based on these findings, the trial court granted the preliminary injunction, mirroring the temporary restraining order but adding an additional requirement that the State Board not take "any actions or impos[e] any requirements stemming from its designation of the Tulare [subbasin] as probationary under … section[s] 10735.6[, subdivision ](a) and 10735.2[, subdivision ](a)(3)."

Following this, the trial court ordered "a nominal undertaking of $1.00." The trial court stated it had reviewed the submissions on the bond amount but decided they were "unauthorized and stricken pursuant to [Code of Civil Procedure sections] 128 and 1005." The trial court noted that even if considered, the declarations were conclusory and did "not contain sufficient information for this Court to set a bond in the amount of $7.2 million." The trial court expressly left open the possibility of reconsidering the sufficiency of the bond. Notably, the trial court later rejected an objection challenging the bond amount.

Following these rulings, the State Board filed several actions relating to these proceedings. First, on September 30, 2024, the State Board timely appealed the preliminary injunction. Then, in November 2024, the State Board filed a petition for writ of supersedeas, arguing the preliminary injunction was prohibitory in nature, improper, and should be stayed to protect the State Board's appeal. Finally, also in November 2024, the State Board filed a petition for writ of mandate challenging the trial court's ruling on demurrer and seeking to stay the underlying proceedings until the writ was resolved.

## DISCUSSION

The State Board appeals the trial court's imposition of a preliminary injunction precluding the State Board from, among other things, taking any actions or imposing any requirements stemming from designating the Tulare subbasin as a probationary basin under the Act. The State Board contends the trial court erred in all aspects of the relevant analysis, imposed an improper bond, and exceeded the permissible limits of injunctive

10.

relief. The Farm Bureau argues the trial court's analysis was well within its discretion and that several errors alleged are the result of the State Board's own missteps and not errors by the trial court. For the following reasons, we agree with the State Board that the trial court abused its discretion in imposing broad injunctive relief but remand so the trial court can consider whether a narrower injunction may remain appropriate.

## *Standard of Review and Applicable Law*

"Pursuant to Code of Civil Procedure section 526, trial courts are authorized to issue injunctions during the litigation. A trial court deciding whether to issue a preliminary injunction weighs two interrelated factors—the likelihood the moving party will prevail on the merits at trial and the relative balance of interim harms that are likely to result from the granting or denial of preliminary injunctive relief." (*County of Kern v. T.C.E.F., Inc.* (2016) 246 Cal.App.4th 301, 315 (*County of Kern*).) "Appellate review of a trial court's order granting or denying a motion for preliminary injunction generally is 'limited to whether the trial court's decision was an abuse of discretion.' " (*Tulare Lake Canal Co. v. Stratford Public Utility Dist.* (2023) 92 Cal.App.5th 380, 402 (*Tulare Lake*).)

"The party challenging the trial court's order to grant or deny a preliminary injunction has the burden of making a clear showing of such an abuse of discretion." (*Tulare Lake, supra*, 92 Cal.App.5th at p. 403.) This showing is typically made in one of three ways, each of which is reviewed differently. First, where the court applies an incorrect rule of law. We review questions of law, including relevant statutory constructions, de novo. Second, where the court makes factual findings without evidentiary support. We review such findings under the substantial evidence standard. Third, where the court improperly weighs the interrelated factors. We review this balancing purely for an abuse of discretion, asking whether the court exceeded the bounds of reason or contravened uncontradicted evidence. (*County of Kern, supra*, 246 Cal.App.4th at p. 316.)

"When the order *grants* a preliminary injunction, the restrained party need only show that the trial court abused its discretion as to one of the two factors. [Citation.] Thus, it is well established that granting a preliminary injunction without a showing of a likelihood of success on the merits is an abuse of discretion and will be reversed. [Citation.] Furthermore, when the likelihood of prevailing on the merits depends on a question of law, an appellate court independently decides that question of law and, thus, whether there was a possibility of the moving party succeeding on the merits." (*County of Kern,* sup*ra*, 246 Cal.App.4th at p. 317.)

### *Likelihood of Success on the Merits*

In line with the trial court's obligation to weigh the potential for success on the merits with the relative balance of harms to each party, we begin by considering whether the trial court correctly concluded the Farm Bureau was likely to succeed on the merits of its claims. In its order granting the preliminary injunction, the trial court found a likelihood of success on the merits existed with respect to the Farm Bureau's second, fourth, fifth, and sixth causes of action—the good actor, exceeding authority, notice, and underground regulation claims. In our determination that the State Board was entitled to a writ of mandate because its demurrer was incorrectly denied, we found that the Farm Bureau's underground regulation claims were barred because the Act specifically exempts the State Board's conduct from the APA. (*State Water Resources Control Bd. v. Superior Court, supra*, __ Cal.App.5th __ [Cal.App. Lexis ____].) Accordingly, that sixth cause of action cannot support a likelihood of success on the merits finding and was incorrectly considered by the trial court. We next review the other causes of action considered by the trial court.

*The Second Cause of Action—Good Actor Exclusion Claim*

The Farm Bureau's second cause of action alleged that the probationary determination must be set aside because the State Board applied an improper interpretation of section 10735.2, subdivision (e). According to the Farm Bureau, the

State Board's application of this section was flawed in two ways.  First, by requiring that a groundwater agency was required to request exclusion and, second, by determining that an exclusion could not be granted unless there existed at least one valid groundwater plan.

Additional Factual and Procedural Background

The trial court sided with the Farm Bureau when granting the preliminary injunction.  The trial court determined the statutory scheme created "an affirmative mandate, not an optional duty" to exclude certain portions of the basin from the probationary designation under certain circumstances.  Reviewing the record, the trial court noted that two groundwater agencies had requested an exclusion and that the State Board had failed to analyze whether any groundwater agencies "were managing groundwater sustainably and qualified for the [exclusion]."  The court found the State Board's interpretation of the relevant law "renders the 'good actor' exclusion a nullity" and that the Farm Bureau was likely to succeed on the merits because the State Board "failed to consider the possibility that any [groundwater agency] should be excluded; thereby failing to perform their mandate."

On appeal, the State Board refines its interpretation of the statute, arguing that it is both proper to require groundwater agencies to request the good actor exclusion and to deny that request when no groundwater agency is acting under a valid groundwater plan for the excluded area.[5]  According to the State Board, the incorporated definitions applicable to the statutory scheme render their interpretation the only reasonable one and the only one consistent with the plain language of the statute.

---

[5]     The Farm Bureau considers the State Board's argument to be a new position raised for the first time on appeal.  We do not agree.  While the State Board has refined its argument, it has always relied on a plain meaning reading of the statute and its associated definitions.  Its refined understanding of how that definition is best applied to this case does not demonstrate a new position.

Analysis

We begin our analysis by considering whether the State Board properly required groundwater agencies to request an exclusion. Under the law, the State Board "shall exclude from probationary status any portion of a basin for which a groundwater sustainability agency demonstrates compliance with the sustainability goal." (§ 10735.2, subd. (e).) There is no dispute that the "shall exclude" language means that the State Board must grant the exclusion if the statutory requirements are met. The State Board argues, however, that it is the groundwater agency's obligation to request and prove it is entitled to the exclusion. We agree that the plain language supports this reading.

The statute provides that the State Board must grant the exclusion if applicable. Thus, it is clear that under at least some circumstances, the State Board has an affirmative obligation to consider areas of the basin for exclusion. The question thus shifts to what circumstances trigger the State Board's obligation. There, the statute provides clear guidance that the exception shall be granted when "a groundwater sustainability agency demonstrates compliance with the sustainability goal." (§ 10735.2, subd. (e).) The plain language places the burden on the groundwater agency to demonstrate compliance.

In the context of the statutory scheme, the State Board considers the probationary designation either because certain steps have not been taken by a groundwater agency or the Department has determined the groundwater plan is inadequate or not properly implemented. (§ 10735.2, subd. (a).) The exclusion from the probationary designation also necessarily comes "after notice and a public hearing" regarding the basis for the probationary designation because that step is required before the probationary designation from which the exclusion applies can be made. (*Ibid.*) In this context, State Board has already identified a failure to act or other facts which potentially support a probationary designation. To demonstrate compliance and justify an exclusion, a groundwater agency would need to alert the State Board to relevant considerations. All told, then, the language and statutory scheme clearly indicate that the State Board shall exclude portions

14.

of a basin from its probationary designation when a groundwater agency requests exclusion and demonstrates compliance with the sustainability goal.

Although the court incorrectly concluded the State Board had a duty to independently consider exclusions across the basin, this does not resolve the issue as the trial court also noted that at least two groundwater agencies had specifically requested exclusion based on unique aspects of their local areas, and the State Board had denied those requests because the overall groundwater plan had been deemed inadequate. We therefore consider the next argument put forth by the State Board, that section 10735.2 requires the State Board to deny an exclusion request when no groundwater agency is acting under a valid groundwater plan for the excluded area.

As noted, the statute requires an exclusion for "any portion of a basin for which a groundwater sustainability agency demonstrates compliance with the sustainability goal." (§ 10735.2, subd. (e).) The State Board notes that "sustainability goal" is a defined term under section 10721, subdivision (u) and that through various nested definitions, the statute must be read to require proof of a groundwater plan for the area that protects against undesirable results throughout the basin for the good actor clause to be applicable. Thus, if only one plan is submitted and that plan is insufficient, no portion of the basin can be excluded from the probationary determination.

Looking at the nested set of applicable definitions, we do not agree. Under section 10721, "sustainability goal" is defined as "the existence and implementation of one or more groundwater sustainability plans that achieve sustainable groundwater management by identifying and causing the implementation of measures targeted to ensure that the applicable basin is operated within its sustainable yield." (§ 10721, subd. (u), relevant nested definitions underlined.) Within this definition, a "groundwater sustainability plan" is "a plan of a groundwater sustainability agency proposed or adopted pursuant to this part." (*Id.*, subd. (k).) "Sustainable groundwater management" is "the management and use of groundwater in a manner that can be maintained during the

15.

planning and implementation horizon without causing undesirable results." (*Id.*, subd. (v).) And "sustainable yield" is "the maximum quantity of water, calculated over a base period representative of long-term conditions in the basin and including any temporary surplus, that can be withdrawn annually from a groundwater supply without causing an undesirable result." (*Id.*, subd. (w).) An "undesirable result" is "one or more of the following effects caused by groundwater conditions occurring throughout the basin," such as chronic lowering of groundwater levels, significant and unreasonable reduction of groundwater storage, significant and unreasonable degraded water quality, or significant and unreasonable land subsidence, among others. (*Id.*, subd. (x).)

Notably, nothing within the nested set of definitions, nor the main definition, require that a full basin plan be approved by the State Board in order for any portion of the basin to be excluded from a probationary determination. Nor would this make sense under the plain language of the exclusion, which notes that "any portion of a basin" can be excluded if it meets a statutory requirement. (§ 10735.2, subd. (e).) That statutory requirement is compliance with the sustainability goal, which is defined as a groundwater plan that achieves sustainable management through measures targeted to ensure the basin operates within its sustainability yield. The plan itself, by a nested definition, only needs to be proposed or adopted by the groundwater agency. (§10721, subd. (k).) And both sustainable management and a sustainability yield focus on avoiding identified undesirable results. (*Id.*, subds. (v), (w), (x).)

These definitions undoubtedly consider effects across the basin as a whole and, similarly, the Department initially considers whether the plan, or all plans combined, meet the sustainability goal for the basin as a whole. (§ 10733.) However, nothing in the exclusion requirements and relevant definitions mandate that each individual plan be sufficient to protect the entire basin or that there be an individualized plan for each portion of the basin that seeks an exclusion. Rather, while the joint plan or all plans together must provide measures targeted to protect the entire basin when evaluated by the

16.

Department and the State Board, this is only required to avoid the basin as a whole being deemed probationary. (§§ 10733, 10735.2, subds. (c), (e).) Under the exclusion provision, any portion of the basin for which the adopted plan meets the sustainability goal by avoiding undesirable results must be excluded from that designation.

This makes particular sense in the context of a single plan adopted by multiple groundwater agencies. Multiple groundwater agencies are authorized to work together to draft a single plan that protects the overall basin. (§ 10727, subd. (b)(2).) Inherent in such a collaborative effort is the necessity of compromise across the various groundwater agencies to ensure the overall plan is feasible. Certain requirements imposed may be insufficient to fully prevent undesirable results in portions of the basin without those same requirements being implemented in other portions of the basin where they are not needed to prevent undesirable results locally. Yet such measures might be agreed upon across the entire basin to ensure the plan operates as intended. A groundwater plan that ultimately fails to avoid undesirable results across the entire basin, therefore, does not necessarily fail to avoid undesirable results in each individual groundwater agency's jurisdiction. In order to give effect to both the right to coordinate on a plan and the express requirement to exclude "any portion of a basin" that proves the plan meets the sustainability goal by avoiding undesirable results in that portion of the basin, the statute cannot be read to require independently approved plans.[6]

Such a reading also makes sense when each groundwater agency adopts its own plan and asserts that the combination of plans satisfies the Act's requirements. In that

_____

[6] Although they appear not be utilized in this instance, the underlying regulations permit the designation of management areas which are subject to their own appropriate levels of monitoring and analysis provided an explanation is given why operating under those different conditions would not cause undesirable results outside the management area. (Cal. Code Regs., tit. 23, § 354.20.) Precluding consideration of a good actor exclusion because a single, unified plan failed would eliminate the purpose of such regulations.

17.

case, while the plan as a whole may be deemed incomplete, the State Board's argument acknowledges that one or more independent plans may be individually acceptable.

In this case, unique aspects of two portions of the Tulare subbasin where groundwater levels were relatively stable, subsidence rates were low, and additional factors limited groundwater extractions, along with actions taken by one groundwater agency in the form of additional well mitigation, registration, and metering programs, were offered as proof that the global plan was sufficient to meet the sustainability goals in those portions of the basin.[7] The State Board is alleged to have wholly failed to consider this offer of proof on the ground that the global plan was inadequate. If this allegation were proven, and assuming no portions of the overall rejection demonstrate that the adopted plan fails to meet the sustainability goal in these local areas, a point we do not consider at this stage of the proceedings, the statutory scheme requires that these portions of the basin be excluded from the probationary designation.[8] Given the facts presented to the trial court suggesting the exclusion was denied based on the failure of the unified sustainability plan alone, the trial court was correct in finding a likelihood of success on the merits as to the good actor exclusion claim.

### The Fourth Cause of Action—Exceeding Authority Claim

The Farm Bureau's fourth cause of action alleged that the State Board exceeded its authority in adopting the probationary designation under seven different theories. These

---

[7] The State Board argues these claims "are too narrow and do not reflect compliance with the sustainability goal." That assertion carries no weight. The allegations suggest the State Board never conducted an independent inquiry into the effect of the overall plan on the sustainability goal within the requested good actor exclusion zones.

[8] Under the statutory scheme and relevant regulations, this court finds no basis to conclude that the determination that a plan is incomplete is equivalent to a finding that the plan does not meet the sustainability goals in a particular area of the basin. There are many reasons why a plan may be incomplete but still meet the sustainability goals if implemented in a specific area, such as the need for technical definitions and goals that are relevant across the entire basin but unnecessarily strict in the local area. (See Cal. Code Regs., tit. 23, § 354 et seq. [identifying plan requirements].)

theories are: (1) It is improper to require groundwater agencies to submit amended groundwater plans to the State Board during the intervention process; (2) The State Board improperly expanded the alleged deficiencies supporting the inadequacy finding; (3) The State Board improperly required immediate compliance with the sustainability goal; (4) The State Board considered policies outside of the Act; (5) The State Board's designation violates other State Board policies; (6) The State Board does not have the authority to require that all extractions be metered, monitored, and reported; and (7) The State Board could not require groundwater agencies to request a good actor exclusion.[9]

### Additional Factual and Procedural Background

The trial court found the Farm Bureau was likely to succeed on one theory presented, that the State Board exceeded its authority by requiring revised groundwater plans be submitted to the State Board after a probationary designation. In reaching this conclusion, the trial court found a conflict between the State Board's staff report and resolution and the Department's regulations. The court noted the staff report's statement that groundwater agencies could "seek to exit probationary status by submitting [their adopted revised] plan (or plans) to the State … Board" and the resolution's authorization for the State Board's staff to continue providing technical feedback to the groundwater agencies while periodically updating the State Board regarding the groundwater agencies' progress. According to the court, these requirements directly contradict a Department regulation stating that once the State Board "has jurisdiction over the basin or a portion of the basin pursuant to [section] 10735.2, the Department after consultation with the [State] Board, may proceed with an evaluation of the Plan."

### Analysis

The Farm Bureau's claim turns on two well-settled limitations on agency action. First, agency "action must 'be within the scope of authority conferred' by the Legislature,

---

**9** Although not discussed by the trial court or the parties, the seventh factor is considered by this court in its analysis of the second cause of action.

19.

and cannot be inconsistent with its authorizing statutes." (*County of San Diego v. Bowen* (2008) 166 Cal.App.4th 501, 508.) "Second, even if an agency action is consistent with its authorizing statutes, the action may still be deemed void if it conflicts with another statute." (*Ibid.*) In other words, an agency can only act if authorized to do so and may not contradict enacted law, even if doing so stays within its general authorization to act.

We thus first consider whether the State Board is authorized to require groundwater agencies to submit their groundwater plans to the State Board when those plans are revised after a probationary determination. Although there is no direct authorizing statute for such conduct, we find no basis to conclude the requirement exceeds the State Board's regulatory authority. The State Board is generally authorized "to 'exercise the adjudicatory and regulatory functions of the state.' " (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1484.) In this role, the State Board is provided with broad authority to act, "including the authority to 'make such reasonable rules and regulations as it may from time to time deem advisable.' " (*Id.* at pp. 1484–1485.)

As the State Board notes, once a probationary determination has been made, the Water Code shifts responsibilities for future determinations from the Department to the State Board. Initially, groundwater agencies are responsible for both developing and implementing groundwater plans. (§ 10727, subd. (a).) They must also independently assess their groundwater plans for changing conditions and the goal of meeting the sustainability goal for the basin. (§ 10728.2.) Upon adoption and periodically thereafter, the Department is also required to review these plans for conformity with statutory requirements and for likelihood of achieving the sustainability goal for the basin. (§§ 10733, 10733.4, 10733.8.) The Department's review is one of the factors which may result in a probationary determination. Thus, if "the [D]epartment, in consultation with the [State Board], determines that a groundwater … plan is inadequate or … not being

implemented in a manner that will likely achieve the sustainability goal," a probationary designation may be appropriate.  (§ 10735.2, subd. (a)(3).)

Once that probationary designation is made, however, the statutory scheme shifts to determining when the State Board may implement an interim plan.  In that context, the timeframe for developing an interim plan triggers, in part, on whether "the [State Board], in consultation with the [D]epartment, determines that a local agency has not remedied the deficiency that resulted in designating the basin as a probationary basin."  (§ 10735.4, subd. (c); see also § 10735.6, subd. (b).)  Once an interim plan is adopted, the statutory authorization to review groundwater plans narrows again, as "the [State Board] shall determine if a groundwater … plan … is adequate to eliminate the condition of long-term overdraft or condition where groundwater extractions result in significant depletions of interconnected surface waters" only upon a petition from a groundwater agency "that has adopted" a groundwater plan, among others.  (§ 10735.8, subd. (g).)

The shift of authority for review from the groundwater agency and the Department to the State Board in consultation with the Department once the probationary determination is made, then exclusively to the State Board, provides an implicit authority for the State Board to review groundwater plans—both to consider whether to allow an exit from the probationary process and to grant relief from the interim plan once adopted. Given this implicit statutory authority to act, the State Board's general authority to exercise the regulatory functions of the state and to make such reasonable rules and regulations as it may deem advisable necessarily covers the requirement that groundwater plans be submitted to the State Board after a probationary determination is made.

Having found the State Board has the authority under the statutory scheme to implement the contested rule, we next consider whether the State Board's rule conflicts with another statute.  The Farm Bureau and the trial court rely on section 10733 and related Department regulations, California Code of Regulations, title 23, section 355 et seq., which state that the Department must review amendments and "may" do so even

21.

when the State Board has jurisdiction over a basin (Cal. Code Regs., tit. 23, § 355.2). However, this court finds no conflict in these authorities. Rather, the cited statute and regulations merely overlap with the State Board's requirement that groundwater plans also be submitted directly to the State Board after a probationary designation and do not preclude the Department from undertaking any additional review of the plan required by statute.

The primary assertion by the State Board underlying the Farm Bureau's claim states that after groundwater agencies "have adopted a revised plan (or plans) that resolve the deficiencies [identified in the probationary designation], they can seek to exit probationary status by submitting the plan (or plans) to the State … Board." Nothing in the language cited or in anything reviewed by this court indicates that this submission and review by the State Board is to the exclusion of any other statutory requirement. Thus, the obligation to submit any adopted groundwater plan to the Department, as detailed in section 10733.4, is not affected by an additional requirement to submit to the State Board if seeking to exit probationary status. Nor does the Department's regulatory acknowledgement that it "may" continue to review such submissions despite the State Board's jurisdiction, as contained in California Code of Regulations, title 23, section 355.2, mean the State Board's separate submission requirement and analysis for its own purposes is improper. Indeed, given that the law and regulations provide the Department with two years to review submitted plans, submitting the adopted plan to the State Board for review in consultation with the Department appears to be the only way to ensure an exit from probationary status can occur before the one-year deadline for allowing the State Board to develop an interim plan. (See §§ 10733.4, subd. (d) [Department's two-year evaluation window], 10735.6, subd. (b) [one year delay before developing interim plan under certain circumstances]; Cal. Code Regs., tit. 23, § 355.2, subd. (e) [Department "shall evaluate a Plan within two years of its submittal date"].)

In the context of this case, at the point the State Board requests submission of amended plans to exit probationary status, the Department has already reviewed the original plan, identified it as deficient, provided recommended corrective actions, and consulted with the State Board. The State Board has also already made the probationary designation and again identified specific deficiencies and potential actions to address them. (See §§ 10733.4, 10735.2, 10735.6.) At this point in the statutory scheme, the State Board's review of a revised plan does not result in any of the concerns the Farm Bureau alleges "would render nugatory vast swaths of the law." Accordingly, having concluded the State Board acted within its authorization and without conflicting with other statutory provisions, we conclude the trial court erred in finding the Farm Bureau had a likelihood of success on the merits of its fourth cause of action.

*The Fifth Cause of Action—Notice Claim*

The Farm Bureau's fifth cause of action alleged a failure to comply with the statutory notice requirements of section 10736, subdivision (b)(3)(B), which states that at "least 60 days before the hearing, the [State Board] shall mail or send by electronic mail notice to all persons known to the [State Board] who extract or who propose to extract water from the basin, or who have made written or electronic mail requests to the [State Board] for special notice of hearing pursuant to this part." According to the complaint, although the probationary determination alleged compliance, it contained no evidence of such compliance, and "[n]ot all landowners in the Tulare … [s]ubbasin received notice of the April 16, 2024, probationary hearing."

Additional Factual and Procedural Background

In its order granting the preliminary injunction, the trial court recognized "two notice injuries—the failure to comply with the probationary hearing notice and the failure to timely provide notice of new metering, calibration and reporting requirements, as referred to as the 'compliance notice.'" On the failure to comply with the probationary hearing notice, the trial court acknowledged evidence from the hearing notice that notice

23.

was emailed to " 'Kings County, Tulare County, Kern County, City of Hanford, City of Corcoran, and City of Lemoore' "; " 'approximately 2,000 parcel owners identified by the [State Board] as persons who extract or propose to extract groundwater from the subbasin based on publicly available well information' "; " 'all public water systems … in the subbasin' "; " 'the Santa Rosa Rancheria Tachi Yokut Tribe' "; and "the '[State Board's] groundwater management email list.' "  It also recognized statements in the staff report summarizing these efforts and outlining the proper notice requirements.  And it noted the State Board had submitted a declaration from Samuel Boland-Brien claiming on personal knowledge that the State Board complied with the required notice requirements, along with a declaration from Sarah Sugar who stated that the State Board "issued on October 12, 2023 notice of a probationary hearing for the [Tulare subbasin]."

On the new requirements notice issue, the trial court acknowledged a declaration from State Board employee Natalie Stork who declared and provided exhibits supporting claims the State Board (1) " 'emailed notice of the new requirements to its [Tulare subbasin] email list on May 24, 2024,' " (2) " 'mailed notice to its list of known pumpers on May 31, 2024,' " (3) " 'followed up with a second mailing of the same notice on June 20, 2024,' " and (4) "sent a final notice to known pumpers on July 9, 2024."  The court stated this declaration "confirms that notices were sent late to extractors and corroborates the experiences of Martella, Sullivan and [Zach] Bickner."

The trial court also noted that declarations from Martella, Sullivan, Bickner, and Phil Bartel alleged that "approximately 45 days after [the State Board] adopted its Probationary Designation, compliance notices were sent to landowners in the [Tulare subbasin] advising them of the metering, calibration and reporting requirements."  These notices were dated May 24, 2024, but were sent out in part on that day, May 30, 2024, and June 20, 2024.

Notably, the trial court rejected the three State Board declarations, stating they "lack information about the basis of the declarant's information.  If there is a 'list of

known pumpers' or 'email list' or 'mailing list' containing emails or mailing addresses[,] why was that not included?" Based on this, the court found the State Board "has failed to set forth any competent evidence, i.e.[,] someone with personal knowledge as to the persons and dates when the notices were sent, posted, or emailed," and concluded the existing declarations are "insufficient for this Court to conclude the notice provisions of [section] 10736 were complied with." The court also found the "late notices of the metering, reporting and calibration requirements exacerbated the injury" and that for "an extractor, 90 days' notice is not a reasonable period of time." The court thus found the Farm Bureau "likely will prevail on the merits of these claims."

Analysis

On appeal, the State Board argues the trial court wrongly looked to the post-determination notices to support the Farm Bureau's claim and otherwise ignored uncontroverted evidence that the State Board had properly complied with section 10736. In response, the Farm Bureau wholly relies on a claim the trial court properly discounted the State Board's evidence and thus did not abuse its discretion. We agree with the State Board's position.

To the extent the trial court relied on the post-determination notices as support for a success on the merits finding, it erred as a matter of law. The claim pursued relied exclusively on section 10736. Section 10736 provides notice requirements for, relevant to this case, times when the State Board adopts a determination under section 10735.2. (§ 10736, subd. (a).) In that context, the State Board must (1) publish notice of the required hearing on its Web site at least 90 days in advance; (2) notify the Department and each city, county, or city and county in which any part of the basin is situated at least 90 days in advance; and (3) mail or e-mail notice to all persons known to the State Board who extract or who propose to extract water from the basin, or who have requested notification, at least 60 days in advance. (*Id.*, subd. (b).) Notice concerning the results of the hearing or of the consequences of a probationary designation are not required under

25.

section 10736.  Thus, to the extent the court relied upon notice given for those reasons to demonstrate a likelihood of success on the merits under section 10736, it erred.

The question thus turns to whether substantial evidence supports the trial court's determination that the State Board likely failed to provide proper notice under section 10736.  (See *County of Kern, supra*, 246 Cal.App.4th at p. 316 [evidentiary determinations reviewed for substantial evidence].)  Notably, there is no argument or evidence presented that the State Board failed to properly publish notice of the required hearing on its Web site or provide notice to each city, county, or city and county in which any part of the Tulare subbasin is situated.  Rather, the complaint only challenges the State Board's required notice to " 'all persons known to the [State] Board who extract or propose to extract water from the basin.' "  The complaint itself only notes that the State Board had not released the list of people noticed, despite stating it had provided proper notice, and that "[n]ot all landowners in the Tulare … [s]ubbasin received notice" of the hearing.

These allegations alone are insufficient to demonstrate a likelihood of success on the merits.  They lack at least one necessary allegation—that the landowners who did not receive notice of the hearing were known to the State Board as persons who extract or propose to extract water from the basin.  (§ 10736, subd. (b)(3)(B).)  Looking at the remaining evidence in the record, the declarations from the Farm Bureau cited by the trial court do not contain indications that notices were not sent to known persons more than 60 days prior to the hearing.  Rather, these declarations focus on the post-determination notice provided and the difficulties of complying.  Nor is this surprising.  The Farm Bureau did not initially request a preliminary injunction based on lack of notice and only pursued the issue after alleging the State Board had failed to submit evidence of actual compliance in its response to the trial court's order to show cause.

The trial court never initially considered whether the Farm Bureau's complaint or evidence demonstrated a likelihood of success on the merits with respect to the notice

26.

claim and failed to complete that required step after rejecting the State Board's affidavits claiming compliance. Even if this court accepts that the trial court properly rejected those affidavits, their exclusion does not justify the trial court's ruling. As noted, the complaint itself fails to adequately allege a violation of the law, and the evidence submitted by the Farm Bureau does not correct this flaw. Equally important, even without the affidavits, there remains uncontested evidence in the record that the State Board did comply. As noted by the trial court, and not excluded by its rulings, the full staff report provides that notice was provided to more than 2,000 parcel owners known to extract or propose to extract groundwater from the Tulare subbasin based on well records, as well as to cities and counties in the basin and all subscribers of the State Board's groundwater management email list. In contrast, there is no evidence or allegation in the record that the State Board failed to notify any persons known by the State Board to extract or propose to extract groundwater from the basin. Substantial evidence therefore does not exist upon which the trial court could reach its determination that the Farm Bureau was likely to succeed on the merits of this claim. (See *Braewood Convalescent Hospital v. Workers' Comp. Appeals Bd.* (1983) 34 Cal.3d 159, 164 ["The term 'substantial evidence' means evidence 'which, if true, has probative force on the issues. It is more than a mere scintilla, and means such relevant evidence as *a reasonable mind might accept as adequate to support a conclusion …. It must be reasonable in nature, credible, and of solid value ….* "].)

*Summary of Likelihood of Success Review*

Our review of the trial court's likelihood of success on the merits analysis shows that only one of the four grounds cited by the trial court supports its analysis. Accordingly, the trial court's order, if it is to stand, must do so based on an analysis that relies only on a likelihood the Farm Bureau will succeed in showing that two groundwater agencies were improperly denied an analysis that could, at most, exclude them from the overall probationary designation. This limitation on the scope of the

27.

analysis undercuts the broad scope of the injunction issued and warrants, at the least, limiting the scope of the injunction. We next consider the court's overall balancing of relative harms in light of this limitation on its analysis.

## *Relative Balance of Harms*

The State Board challenges the trial court's determination that the relative harms to the Farm Bureau were "far greater than any harms identified by" the State Board. According to the State Board, the trial court wrongly determined a statutory deadline was discretionary, improperly focused on compliance costs, incorrectly found harm from notice of the probationary finding, and failed to recognize the Farm Bureau's harms were speculative.

### *Applicable Law*

"Typically, the trial court's evaluation of the relative balance of harms compares the interim harm the plaintiff is likely to sustain if the injunction is denied to the harm the defendant is likely to suffer if the preliminary injunction is issued." (*Tulare Lake, supra*, 92 Cal.App.5th at p. 396.) These harms can include, where appropriate, harms to the public interest. (*O'Connell v. Superior Court* (2006) 141 Cal.App.4th 1452, 1471.) They typically do not, however, include harms that can be fully compensated by the payment of damages. "A plaintiff seeking a preliminary injunction must generally show a risk of irreparable harm in the absence of injunctive relief pending adjudication of the merits." (*Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2024) 106 Cal.App.5th 982, 992.) "While the mere possibility of harm to the plaintiffs is insufficient to justify a preliminary injunction, the plaintiffs are 'not required to wait until they have suffered *actual harm* before they apply for an injunction, but may seek injunctive relief against the *threatened infringement* of their rights.' " (*Cosa Mesa City Employees Assn. v. City of Costa Mesa* (2012) 209 Cal.App.4th 298, 305.)

*The Trial Court's Analysis*

The trial court's order discussed the harm alleged for both parties. At the outset, it explained that the Farm Bureau's "harms stem from [the State Board's] actions in designating [the Tulare subbasin] as probationary. These include metering, reporting and calibration requirements" and "are triggered by the timing of these actions (the July 15, 2024 deadline to occur in the middle of an irrigation season) .…" The court further noted the "harms include the confusion created" by the State Board's actions, particularly given that failure to properly comply with the requirements of the designation could result in an obligation to pay investigation fees for claimed failures to report along with fines and penalties.

Following this summary, the trial court summarized the declarations submitted by the Farm Bureau. Within those declarations, the trial court found evidence that multiple individuals had been notified in or around May 2024 that they would need to begin complying with monitoring, calibration, and reporting requirements by July 15, 2024. The declarations identified certain wells that had been recently calibrated or installed and other wells that did not currently have calibrated flow meters installed, which the declarants stated would have to be recalibrated or undergo meter installations to comply with the upcoming requirements. The declarations showed that costs for such actions ranged from $1,800 to $3,000 per meter in the past, but that recent orders for new meters or for calibration requests could not be completed before the deadline to start monitoring and could cost up to $6,000 per meter. The declarations also showed that at least one farm's annual fees would range between $17,400 and $46,400, and that decisions on which crops to plant and what total employee headcount could be supported would be affected by those costs. Finally, the declarations showed that calibrating or installing meters does not typically occur during the irrigation season and changes required during irrigation season would cause significant disruptions to local farming operations during a critical time.

29.

The trial court next summarized its views on the State Board's alleged harm. There it found the State Board had "not shown what specific, identifiable harm will occur if [the Tulare subbasin] extractors do not comply with installation of meters … and reporting requirements" that do not come due until later, in part because the State Board did not disclose what information it already had about extractions. The court also found a lack of allegations whether failure to comply "will cause wells to go dry, land subsidence to occur or get worse or water quality to degrade or get worse," or, in other words, no nexus between the failure to implement and the issues of concern.

The trial court summarized several declarations submitted by the State Board. However, for each, the trial court determined the declarations were insufficient for one reason or another. The court found that a declaration discussing the reporting systems used by the State Board for groundwater extractions demonstrated knowledge but failed to identify any harms from a failure to report or why the reported data was needed. Another declaration related to work done to mitigate impacts of excessive groundwater extraction was discounted because it did not contain any connection to the Tulare subbasin. A declaration relating to effects on domestic water users was found to lack reliable and specific information on how those effects would be impacted by an injunction. A fourth declaration, relating to environmental harms, failed to tie those harms to an inability to track and report groundwater extractions. A declaration discussing the lack of monitoring networks in the Central Valley was discounted as stale and failing to demonstrate how the preliminary injunction would affect that issue. The final declaration discussed, concerning addressing deficiencies in extraction information, was dismissed as overly general and failing to explain how the court's injunction would actually harm the relevant interests. Despite rejecting these specific declarations, the trial court did acknowledge certain public factors such as the importance of water to the public interest, the desire to equitably implement the law, and the duty to consider adverse effects to public resources.

Based on its review of the evidence, the trial court found the State Board had "not shown any nexus between the Court's issuance of a preliminary injunction and any harm. They are not likely to prevail on the merits and there is no presumption of harm that arises." The court then issued a preliminary injunction in favor of the Farm Bureau.

*The Court Properly Considered the Immediate Impacts of the Designation*

In its appeal, the State Board challenges the trial court's findings with respect to the Farm Bureau's alleged harms. It contends the court wrongly premised its findings on a conclusion that the State Board's deadline for reporting was arbitrary, despite it being mandated by the statutory scheme. It then argues that economic harm cannot support an injunction because those harms are tied only to complying with the statutory scheme. The State Board next argues the trial court could not rely on the courtesy notices sent after the probationary designation to find irreparable injury because those notices were not required in the first place. Finally, the State Board raises several arguments concerning why each type of harm alleged in this case is speculative, from future fees being barred by the pay first rule, to a lack of evidence that there is a difference between the state requirements and existing local requirements, to a misinterpretation of what the state requirements actually were, and finally to a claim there was only speculative evidence as to what future costs may exist.

The Farm Bureau responds with allegations that the State Board is relying on misinterpretations of the governing legal principles and incorrect applications of the underlying law. It then lays out several harmful aspects of the State Board's actions, which it claims were acknowledged by the trial court, before additionally identifying evidence it claims is nonspeculative supporting those points. Based on these points and the evidence cited, the Farm Bureau argues there is no basis to conclude the trial court abused its discretion when issuing the preliminary injunction.

Upon review, we generally agree with the Farm Bureau. We note at the outset that the State Board does not meaningfully challenge the trial court's findings with respect to

31.

its alleged harm.[10]  This is notable because the trial court found the State Board would not suffer a substantial level of harm from an injunction through the course of a trial on the relevant claims, in part because the short-term delay would not prohibit the State Board from meeting the statutory scheme's long-term goals of sustainability. Accordingly, in the overall balance, the trial court was not faced with a situation where a potential for substantial harm needed to be balanced across both parties, but instead a situation where a potential for substantial harm to one party was balanced against minimal harm to the other.

The trial court found that imposing substantial statutory requirements on large groundwater extractors, including multiple farmers, during irrigation season would result in substantial harm.  Despite the State Board's arguments, the trial court's analysis was not predicated on an improper understanding of the statutory deadlines imposed by the decision.  Rather, as the Farm Bureau points out, the trial court was swayed in part by its conclusion that there was no statutory requirement for the State Board to adopt the probationary designation on April 16, 2024.  This flexibility in setting a date for the probationary designation, and therefore by statutory command the date for compliance with the start of monitoring requirements, meant that determining the extent of the harms suffered from an improper designation could rationally consider when compliance was required.  Although the trial court generally discussed issues in the context of the delayed notice of these requirements, a focus which we have noted is not warranted, its recognition of the importance of the timing of those effects is not undermined by that

---

**10**     The State Board suggests the trial court failed to properly account for public interests as expressed in the Act and relied on an improper timeframe for implementation under the Act, suggesting nothing needed to be done before 2040.  The trial court, however, did acknowledge the State Board's claims of harm but discounted them based on their general connection to the Act as opposed to their connection to the injunction issued.  Nothing in the State Board's arguments demonstrates the trial court's decision not to assign substantial weight to the public interests considered or the timing of relevant actions was arbitrary or completely lacking in evidentiary support.  (See *County of Kern, supra*, 246 Cal.App.4th at p. 316 [discussing various ways court may abuse its discretion].)

focus.  (See *Loy v. Kenney* (2022) 85 Cal.App.5th 403, 406 [we accept all evidence supporting the order and review the trial court's decision, not its reasoning].)

In the context of this case, the evidence credited by the trial court shows that many of the monitoring requirements imposed would need to be completed in a short period of time, at a relatively high cost, during a period of time where irrigation requirements meant that repairs were normally deferred to avoid affecting crop yields and, ultimately, the success of the harvest.  As noted above, these concerns were raised in various declarations and supported not only by direct assertions, but evidence of anticipated costs and expected delays owing to a lack of available components and personnel capable of installing the required meters.  While there was an inevitable economic component to all of these concerns, underlying them, and recognized in the interests discussed by the trial court, was the effect immediate compliance would have on the less tangible interests of the people and viability of the businesses affected.  These interests could support injunctive relief.  (See *Donahue Schriber Realty Group, Inc. v. Nu Creation Outreach* (2014) 232 Cal.App.4th 1171, 1185 [potential loss of goodwill a relevant harm]; *Alliant Ins. Services, Inc. v. Gaddy* (2008) 159 Cal.App.4th 1292, 1311 [potential loss of clients supported injunctive relief]; *Jay Bharat Developers, Inc. v. Minidis* (2008) 167 Cal.App.4th 437, 447 [where interim harm was more than just money, injunctive relief was appropriate].)

We likewise disagree with the State Board that the types of harm likely to be suffered by the Farm Bureau are too speculative to support a preliminary injunction.  The declarations submitted asserted that certain costs would be required to comply with the monitoring and reporting requirements imposed and that the timing of those costs would result in substantial harm to extractors during the irrigation season and beyond through lost revenues, impacts on crop planting and harvesting, and potential job losses due to the increased fees.  Each of these harms results in both monetary and intangible harms to the businesses that, even if not obviously quantifiable, were not speculative.  (See *Huong*

33.

*Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 418 ["If a plaintiff can show that defendant's conduct threatens him with unlawful injury, his inability to quantify the harm already suffered, or likely to be suffered, is not a ground for denying injunctive relief. On the contrary, 'extreme[] difficult[y]' in ascertaining damages is a factor *favoring* injunctive relief."].)

While the State Board argues any harm is also speculative because the alleged modifications may already be covered by existing regulations, its argument relies on an assertion that the declarations cannot support a claim that damages are in addition to those actions already required by local regulations. The declarations clearly state that the declarants will be required to take certain actions specifically because of the probationary designation, even if the scope of those actions are not fully understood. The trial court could accept this evidence even in the face of a claim that existing regulations covered similar acts, and this court will not reweigh that determination. (See *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1450 [appellate court does not resolve conflicts in the evidence, reweigh the evidence, or assess the credibility of witnesses, rather it interprets evidence in the light most favorable to the order].)

Ultimately, this court finds no error in the trial court's consideration of evidence related to the relative balance of harms or in its ultimate determination that those harms weighed in favor of some form of injunctive relief. The court notes however, that it is unclear whether the trial court would balance the competing harms in the same way had it properly determined the likelihood of success on the merits.

*Scope of Remedial Order*

Finally, the State Board argues that the indefinite injunction issued in this matter was improper because it was not sufficiently tailored to the harm at issue. It is well settled that "a judicial remedy must be tailored to the harm at issue" and that a "court should always strive for the least disruptive remedy adequate to its legitimate task." (*Butt v. State of California* (1992) 4 Cal.4th 668, 696–697.) We do not agree with the State

34.

Board's claim that the injunction could not last through the relevant proceedings. The evidence in this case was not limited exclusively to harms occurring during the irrigation season, even if that was a heavy factor, and it is well understood that preliminary injunctions are designed to maintain the status of the parties while a case proceeds to a resolution on the merits. (See *Tulare Lake, supra*, 92 Cal.App.5th at p. 396 ["The general purpose of a preliminary injunction is to preserve the status quo pending a determination on the merits of the action."].) The State Board identifies no case limiting a preliminary injunction to less than the time needed to resolve the merits, and this court has found none.

However, our opinion has identified another issue with the scope of the injunction issued in this case. Here, the trial court's analysis regarding the potential for success on the merits was overly broad, encompassing the entirety of the Tulare subbasin despite the only valid underlying claim covering a portion of the subbasin. The trial court's imposition of a preliminary injunction across the entirety of the Tulare subbasin, unsupported by the likelihood of harm and neither tailored to the relevant harm at issue nor the least disruptive remedy adequate to the task, was therefore an abuse of discretion. (See *O'Connell v. Superior Court, supra*, 141 Cal.App.4th at pp. 1478–1483 [reversing injunction in part because the relief granted was not tied to the underlying harm and, by failing to limit itself to relevant class members, was overbroad].)

### *Claimed Bars to an Injunction*

Although we have determined the trial court's injunction constituted an abuse of discretion, on remand the court may be faced with a renewed request for an appropriate injunction. The State Board has raised certain objections to the imposition of any injunction in this case. We briefly consider those arguments to provide guidance to the trial court on remand.

The State Board first argues the " 'general rule against enjoining public officers or agencies from performing their duties' " precludes any injunction in this case. The State

Board recognizes that there are settled exceptions to this general rule, including one allowing injunctions where the public official's action exceeds their authority, but contends such exceptions are inapplicable based on the trial court's limited focus on only one claim to support the injunction. (See *Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, 501 [identifying four recognized exceptions to the general rule precluding injunctions against public officers and agencies].) The State Board's position is not tenable in this case. Here the lawsuit challenges specific steps taken by the State Board and alleged to be improper under the authority granted by the statutory scheme. Under such circumstances, the challenge is not to execution of the statute, but to the conduct of the agency allegedly exceeding its authority and thus does not implicate the general rule against injunctions. (See *MacLeod v. City of Los Altos* (1960) 182 Cal.App.2d 364, 369–370 [injunction not barred where claim asserts law does not, by its own terms, apply to the plaintiffs].) Under the theories raised here, the underlying agency action is not enforcement of the statutory scheme, but rather the actions leading to enforcement, all of which are alleged to exceed the State Board's authority in one way or another.

The State Board next argues that no injunction can issue in this case because it would violate the pay first rule. This issue was extensively discussed in the related writ proceedings. There we concluded that when a challenge is raised on grounds that imposition of a fee constitutes an unlawful tax, the pay first rule requires that the challenged tax be paid prior to any litigation. (*State Water Resources Control Bd. v. Superior Court, supra*, __ Cal.App.5th __ [Cal.App. Lexis ____].) The State Board contends that a challenge which would, in any way, preclude imposition of an authorized fee triggers this rule.

We do not agree. Under article XIII, section 32 of the California Constitution, only actions which prevent or enjoin the collection of a tax are subject to the pay first rule. A proper challenge to the discretionary decision to declare a basin probationary may seek injunctive relief, even if such relief may delay fees authorized by statute and

36.

triggered by the decision. This is particularly true here, given that the general statutory scheme defines the underlying fees that may be delayed in such a manner that they are exempt from the definition of a tax. (§ 1529.5, subd. (c).) As discussed in the writ proceedings, challenges to the imposition of those fees on the ground an illegal tax has been imposed remain subject to the pay first rule. In this case, however, the Farm Bureau has at least one claim that challenges the probationary designation as it applies to areas covered by certain groundwater agencies and not on the basis that illegal taxation has occurred. Such a claim, seeking proper procedural protections for an agency action, could support injunctive relief despite the pay first rule.

### *This Court Will Not Modify the Undertaking*

The State Board challenges the functionally nominal undertaking required by the trial court in this matter. Further, the State Board argues that, should the injunction be overturned, we should "direct the trial court to order [the Farm Bureau] to pay all damages sustained by virtue of the injunction" in a manner that implies that amount should be set at the amount initially requested below, a bit more than $7,000,000. In response, the Farm Bureau argues the State Board forfeited any argument contesting the undertaking and failed to submit any relevant evidence of its actual harm, and the trial court otherwise properly considered the issue and settled on the only undertaking supported by the evidence.

The State Board reaches the figure it proposed for a proper undertaking by calculating the expected amount of revenue gained from fees imposed under the probationary designation across the basin. The trial court rejected this logic—as well as excluded from the record the evidence supporting it—and determined that a $1 undertaking would be imposed because no evidence supported a higher amount. In the course of its arguments and requests, the State Board continues to rely on a claim that the fees expected to be recovered after the probationary designation are the correct measure of the State Board's harm under Code of Civil Procedure section 529. We do not agree.

37.

The fees upon which the State Board rely do not accurately disclose the harm suffered by the State Board upon the issuance of an injunction barring enforcement of the probationary designation. As detailed in the statutory authorization for the fees, they are set at an amount meant to reimburse the State Board for "all costs incurred and expended from the Water Rights Fund" (§ 1529.5, subd (c)) for a wide variety of activities, including both the investigation leading to the probationary determination and the costs associated with tracking monitoring reports well after the probationary proceedings (*id.*, subd. (a)). (See *id.*, subd. (c) [identifying recoverable costs and limiting fees set to those "sufficient to cover all costs incurred and expended from the Water Rights Fund" for the purposes of the State Intervention chapter of the Act].) Importantly, the statutory authorization notes that "the [State Board] is not required to fully recover these costs in the year or the year immediately after the costs are incurred, but the [State Board] may provide for recovery of these costs over a period of years." (*Ibid.*) Inherently, then, the expected fees are only a measure of some proportional cost of the entire enforcement program, including activities undertaken in other basins.

They are also not a reflection of funds actually needed by the State Board to proceed with the program. Rather, they are a proportional measure of costs which the Water Rights Fund would expect to be reimbursed over the period of the injunction if the state intervention actions proceeded. While replenishing this fund is important, the funds would not be needed to run an enjoined program and would therefore not reimburse costs incurred and expended over the period of the injunction.

On the record and arguments presented, it appears the actual harm was the inability to quickly recover actual costs expended from the Water Rights Fund to reach the probationary designation and begin implementation of the water monitoring and other requirements arising from the designation.[11] Given that the statutory fees work to

---

[11] As noted above, the fees imposed in this case are unique because they are not required to immediately recover the relevant expenditures and can be set to slowly recover those expenses

38.

reimburse costs incurred and expended by the Water Rights Fund, it is evident that such incurred and expended costs are identifiable. The trial court therefore did not err in recognizing that a bare assertion of expected fee payments was not an accurate measurement of the actual harm to the State Board of an injunction.

Ultimately, this court concludes that the State Board's argument that it suffered harm in the form of lost fees that were not properly reflected in the trial court's undertaking determination is not supported by the record—even when considering the evidence of uncollected fees excluded by the trial court. The State Board argues, however, that even if the fees identified are not a correct measure, there is no basis in the law to impose a nominal fee in light of our holding in *Bring Back the Kern v. City of Bakersfield* (2025) 110 Cal.App.5th 322, review granted July 16, 2025, S290840.

In *Bring Back the Kern*, this court considered whether Code of Civil Procedure section 529 granted a court the discretion not to impose an undertaking in environmental litigation. (*Bring Back the Kern v. City of Bakersfield, supra*, 110 Cal.App.5th at p. 360.) Reviewing the statutory language, this court found that a trial court must impose an undertaking that accounts for damages the party may sustain by reason of the injunction. (*Ibid.*) In the course of this discussion, this court affirmed that "[n]ominal bonds untethered to potential damages do not satisfy this requirement," in effect equating bonds imposed for the purpose of being a nominal undertaking with the act of not requiring a bond at all. (*Ibid.*)

This court did not, however, extend that holding to minimal or functionally nominal bonds that are tethered to the evidence of potential damages. In imposing an

---

over a period of years. While the State Board may be able to identify some pecuniary losses from an injunction, the statutory scheme is designed to ensure that all of those costs are eventually recovered over time if local agencies fail to complete their required tasks and a probationary designation is made. Thus, reliance on lost fees does not necessarily demonstrate any actual harm suffered by the State Board from the type of short delay created by a preliminary injunction.

undertaking, the trial court must first determine " 'the types of damages which the law allows a restrained party to recover' " (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1061), or in other words those damages "proximately caused by the wrongful issuance of an injunction" (*id.* at p. 1062). These damages may include costs like attorney fees[12] and may be scaled according to the probability of success on the merits. (*Oiye*, at p. 1062.) Regardless, however, the relevant damages must be indicated or supported in the overall record. (See, e.g., *ABBA Rubber Co. v. Seaquist* (1991) 235 Cal.App.3d 1, 14, 16 [noting evidence of lost sales presented to support undertaking amount while also relying on common knowledge of costs of litigation].)[13] Thus, an enjoined party that makes "no evidentiary showing of his likely damages in the event the preliminary injunction is later determined to have been wrongfully issued … has not demonstrated an abuse of discretion in setting a fairly nominal bond amount." (*Oiye*, at p. 1062.) Having concluded the State Board's only supported argument for damages does not show substantial harm to the State Board from the imposition of a wrongful injunction, we find no basis to specifically order the Farm Bureau to pay the State Board's costs incurred as a result of the injunction according to the evidence submitted by the State Board. Should a

---

**12** In this unique case, the statutory fees should already account for attorney fees incurred in setting aside the injunction. For such fees to be reasonably considered when setting the undertaking, there must be some basis to conclude they would not be recovered in full under the statutory fee structure once the injunction was set aside. This court sees no indication in the record that such a result is possible but takes no position on this issue with respect to future requests.

**13** This court has not been asked to consider whether or to what extent an undertaking must include potential attorney fees when the issue has not been raised specifically or supported by competent evidence as to the likely amount. (Compare *Russell v. United Pac. Ins. Co.* (1963) 214 Cal.App.2d 78, 89 ["A trial judge is necessarily familiar with the value of an attorney's services, and when the nature and extent of such services is made known to the court, its own experience qualifies it to fix their value."] with *ABBA Rubber Co. v. Seaquist, supra*, 235 Cal.App.3d at p. 16 [implying court must consider attorney fees in setting undertaking without indicating issue was raised below].) We consider such an argument forfeited.

new injunction issue, it must be conditioned upon the furnishing of an adequate undertaking as shown at that time.

### *The Supersedeas Writ is Moot*

In the course of these proceedings, the State Board filed a petition for writ of supersedeas seeking a declaration that the trial court's preliminary injunction was mandatory in nature and therefore should not be subject to an automatic stay during the appeal. In this opinion, we have set aside the preliminary injunction, thereby mooting the writ petition. This court takes no position on the mandatory versus prohibitory nature of the preliminary injunction.

## DISPOSITION

The order entering a preliminary injunction is reversed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

The petition for writ of supersedeas is denied as moot.

Costs are awarded to the State Board.

                                                                    HILL, P. J.

WE CONCUR:


DETJEN, J.


FAIN, J.*

---

\*     Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.